2015 PA Super 272

| | |
|---|---|
| IN RE: JOHN MARSHALL PAYNE, III | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: COMMONWEALTH OF PENNSYLVANIA | |
| | No. 1113 MDA 2013 |

Appeal from the Order Entered May 22, 2013
In the Court of Common Pleas of York County
Criminal Division at No(s): CP-67-MD-1000291-1986

BEFORE: GANTMAN, P.J., BENDER, P.J.E., PANELLA, J., DONOHUE, J.,
SHOGAN, J., ALLEN, J., LAZARUS, J., MUNDY, J., and STABILE, J.

OPINION BY BENDER, P.J.E.:                    **FILED DECEMBER 29, 2015**

Herein, the Commonwealth appeals from the trial court's order granting John Marshall Payne III's request for DNA testing of physical evidence taken from the crime scene of the homicide for which Payne was convicted of second-degree (felony) murder and related offenses. The Commonwealth contends the trial court erred when it found that there was a reasonable probability that the results of the testing could demonstrate Payne's "actual innocence," as is necessary to assert a successful claim under the DNA testing statute, 42 Pa.C.S. § 9543.1. Specifically, the Commonwealth argues that the legal framework of Payne's felony murder conviction precludes such a finding because, in order to convict him, the jury was not required to determine whether Payne was the principal actor. After careful consideration, we affirm the trial court's order granting testing.

The instant appeal concerns Payne's *pro se* motion/petition titled "Post Conviction Relief Act petition seeking DNA testing pursuant to 42 Pa.C.S. § 9543.1," which he filed on June 14, 2012. However, the procedural history

of this case began decades ago. In 1986, Payne was found guilty of second-degree murder, aggravated assault, burglary, and conspiracy, after a trial adjudicating the following facts:

On December 17, 1981, the body of a 90 year-old woman, Elsie Rishel, was discovered in her home by members of her family. N.T, 8/18/86-8/22/86 (vol. II), at 406. The victim died as a result of blunt force trauma to the head from an unknown instrument, possibly a telephone found near her body. *Id.* at 417.[1] Rishel's body was found in her blood-soaked bed, with a pillow on top of her head. *Id.* at 427. A trail of blood ran down from her body to a pool of blood on the floor. *Id.* Rishel's dentures and eyeglass were left in the bathroom. *Id.*[2]

Evidence found at the scene was consistent with the theory that the murder had occurred during the commission of a burglary. Rishel's residence appeared "ransacked," with numerous drawers and trunks left

_____

[1] The testifying pathologist, Dr. Joan Gibble, suggested that Rishel's death was likely due to a maximum of three blows, or, stated another way, three "identifiable areas of injury." *Id.* at 420. Dr. Gibble believed that these injuries were consistent with blows delivered from a telephone. *Id.* However, during cross-examination, Dr. Gibble was asked, "From your experience and the extent of the injuries that you observed, could the deceased have suffered such an injury that you observed by falling at someplace in her house and returning to her bed?" *Id.* at 425. Dr. Gibble answered, "Yes, she could have." *Id.* at 426.

[2] This was significant because Rishel's daughter had testified that Rishel always placed her glasses right next to her bed when retiring for the evening. *Id.* at 407.

open and their contents strewn about "haphazardly." *Id.* at 427.[3] A single set of footprints left in the snow around Rishel's home led from the street, around the home, and ultimately to a broken window. *Id.* at 462-63. The window's glass was broken inwards from the outside. *Id.* at 446. A single set of footprints also led from the front door on a diagonal trajectory back to the street. *Id.* at 463. The lead investigator, Officer Robert Harman of the Springettsbury Township Police Department, indicated that there was nothing identifiable obtained from the footprints that could be used for comparison to any suspects. *Id.*

Ultimately, no physical evidence tied Payne to the Rishel burglary/murder; however, numerous pieces of physical evidence were collected from the scene of the crime. For instance, several fingerprints were recovered, although none of the recovered fingerprints matched Payne or his alleged co-conspirators. *Id.* at 441-42. Many of the fingerprints either belonged to the victim or her family members. *Id.* at 445. However, at least one unidentifiable partial fingerprint was found on the glass from the

---

[3] According to Rishel's daughter, a camera appeared to be the only item that had been stolen. *Id.* at 407. Indeed, Rishel's pocketbook was left on the kitchen counter, and cash hidden in one of Rishel's drawers had been left untouched. *Id.* at 407-08.

broken window. *Id.* at 448-449. This evidence, as well as other items collected from the scene, were sent to the F.B.I. for testing.[4]

In the absence of any physical evidence demonstrating his guilt, Payne's conviction was premised primarily on the testimony of three Commonwealth witnesses: Deborah Wallick, Sonny Oglesby, and Christopher Gibson. Wallick, Oglesby, and Gibson each purportedly heard Payne make inculpatory statements to them, individually, concerning the Rishel burglary/murder. Although their accounts of Payne's inculpatory remarks were consistent in broad strokes, there were some significant details that varied between them. All three testified that Payne had told them that he was accompanied by two cohorts during the home invasion, and that a telephone had been used as the murder weapon.[5] However, their stories

---

[4] Forty-four unique items were sent to an F.B.I. laboratory for testing. Payne's Petition for DNA Testing, 6/14/12, exhibit A. In addition to numerous fingerprints taken from the scene, these items included a black plastic telephone, a screwdriver, glass from the broken window, the victim's clothing, numerous bed linens, blankets, pillows, tissues found under the victim's body, panties found on the floor in the bedroom, and vacuum sweepings from the bedroom. *Id.*

[5] Additionally, there was testimony that Payne had revealed his knowledge that the murder weapon was a telephone under suspicious circumstances. Officer Daniel Garber of the Northern York County Regional Police Department conversed with Payne in March of 1983 regarding an unrelated investigation. During that conversation, Payne allegedly told Officer Garber that a State Trooper was accusing him of beating a 90-year old woman to death with a telephone. Officer Garber conveyed Payne's comment to Officer Harman. Officer Harman had asked for assistance from the Pennsylvania State Police in the Rishel investigation in January of 1982. Trooper William Lenker had been assigned to provide that assistance.
*(Footnote Continued Next Page)*

differed considerably with regard to other matters, such as whether Payne had killed Rishel himself, as well as the identity of his co-conspirators.

Wallick's, Oglesby's, and Gibson's credibility were also suspect. Wallick could only vaguely recall when and where Payne had incriminated himself. *Id.* at 480, 483, 494. Related, perhaps, was Wallick's admission that she had been a heavy user of LSD at that time when Payne allegedly confessed to his involvement in the burglary. *Id.* at 491. Additionally, Wallick had previously been convicted of hindering prosecution. *Id.* at 489.

Oglesby and Gibson were jailhouse informants who expected to receive leniency in exchange for their testimony against Payne. At the time of trial, Oglesby had pleaded guilty to third-degree murder in an unrelated case, and had yet to be sentenced for that crime. *Id.* at 520. Part of his plea bargain included his promise to testify against Payne regarding a conversation the two had in prison, in which Payne purportedly inculpated himself in Rishel's death. *Id.* at 528. As he had been charged with homicide generally, Oglesby could have been convicted of first-degree murder in the absence of his plea. *Id.* at 529. Indeed, during cross-examination, Oglesby admitted he knew that the District Attorney had

---

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

Trooper Lenker testified that, as of March of 1983, he had not yet suspected, nor even identified, the telephone as being the murder weapon.

intended to seek the death penalty against him if his case had proceeded to trial. *Id.*

Additionally, Oglesby testified that police did not approach him about obtaining information against Payne. *Id.* at 521. He claimed he volunteered the information to the District Attorney's Office. *Id.* However, Officer Harman remembered things differently. He testified that he "[r]eceived street information that there's a possibility that Sonny Olgesby had some information pertaining to the homicide." *Id.* at 459. Based on that information, Officer Harman "got in contact with Mr. Olgesby." *Id.* at 460.

Gibson was charged with robbery, criminal conspiracy, and firearm offenses before entering a plea bargain just prior to Payne's trial. *Id.* at 545. In exchange for his testimony against Payne, Gibson pled guilty to a single theft offense and received "county time." *Id.* at 550-51, 557. Gibson testified that he had a conversation with Payne in the prison library on August 15, 1986, just three days before the beginning of Payne's trial. *Id.* at 546. Gibson claimed that Payne approached him in the library and asked him what he thought of his legal strategy of deflecting blame for the murder of Rishel onto Rishel's grandson. *Id.* Gibson said he asked Payne "who really done it and he said himself and two other individuals…." *Id.* Gibson also claimed that Payne had asked him a month and a half prior to the August 15th conversation about finding someone to testify that Payne had been employed during the month when Rishel was murdered. *Id.* at 548.

None of these witnesses had any independent knowledge regarding the killing of Elsie Rishel apart from Payne's inculpatory statements, and Payne produced multiple witnesses to rebut Gibson's and Oglesby's testimony. The first of these defense witnesses was Wendell Murray. Murray testified that he assisted Payne in the prison law library on August 15, 1986, the same day Gibson purportedly had a conversation there with Payne. *Id.* at 578. Murray said that he and Payne were engaged in a discussion of Payne's case on that day. *Id.* Murray suggested that Gibson could have learned details of the case by overhearing Payne's conversation with Murray in the close quarters of the prison library. *Id.* Nevertheless, Murray said Payne maintained his innocence in their conversations and, on that specific day, Payne had not spoken directly to Gibson at all. *Id.* at 578-79. Murray also said that Gibson and Oglesby knew each other, and that he had observed them secretly conversing with one another in the prison courtyard the following day. *Id.* at 580-81.

William Jones, another defense witness, had been in the same pod as Oglesby, and said that he and Oglesby became "close" while in prison together. *Id.* at 589. He testified that Oglesby told him that Oglesby had learned many of the details concerning Payne's case from Officer Harman, and not from his conversation with Payne. *Id.* at 589-90. These details included a telephone being used as a murder weapon and the name of one of Payne's co-conspirators. *Id.* at 590. Jones also indicated that, in the week before Payne's trial, he had seen Oglesby and Gibson speaking

together for two hours in the prison courtyard while secluded from the rest of the inmates. *Id.* at 590-91.

Payne testified in his own defense, and denied any level of participation in the burglary or killing of Rishel. *Id.* at 610-42. He said he did not learn that he was a suspect until 1983, and simply did not recall where he was when the crime was committed. He also denied making any inculpatory statements to Wallick, Oglesby, and Gibson. Nevertheless, based primarily on the testimony of those three witnesses, a jury convicted Payne of the above-mentioned offenses. On March 23, 1987, the trial court sentenced Payne to a mandatory term of life in prison.

Payne filed a timely direct appeal, and this Court affirmed his judgment of sentence in a memorandum decision filed on February 29, 1988. *Commonwealth v. John M. Payne, III*, No. 413 Harrisburg 1987, unpublished memorandum at 4 (Pa. Super. filed February 29, 1988). It is unclear from the record whether Payne sought review of that decision with our Supreme Court.

Soon thereafter, Payne sought production of certain documents held by the Commonwealth for the purpose of pursuing post-conviction relief. *See* Motion for Production of Documents *Nunc Pro Tunc*, 8/5/88. The trial court denied the motion, and Payne filed a timely appeal from that decision. This Court affirmed, concluding that the trial court did not err in denying Payne's motion as he was not entitled to discovery for post-conviction relief where no post-conviction petition was pending before the trial court. *See*

*Commonwealth v. John M. Payne,* 624 Harrisburg 1988, unpublished memorandum at 1-2 (Pa. Super. filed May 15, 1989), *allocatur denied*, 45 M.D. Misc. Dkt. 1990 (January 23, 1991).

Payne subsequently filed his first PCRA[6] petition on June 7, 1991, wherein Payne continued to assert his innocence. **See** Payne's 1991 PCRA Petition, 6/7/91, at 3 (stating "Petitioner has maintained throughout all proceedings that he is innocent of the charges that were brought against him…"). The 1991 PCRA petition was denied on June 25, 1992, and Payne filed a timely *pro se* appeal. This Court affirmed "the dismissal of all of [Payne]'s PCRA claims except those regarding his judgments of sentence for conspiracy, burglary, and robbery." *Commonwealth v. John M. Payne*, No. 00581 Harrisburg 1992, unpublished memorandum at 18 (Pa. Super. filed April 30, 1993).[7] Notably, this Court reversed Payne's conviction for conspiracy, holding that the statute of limitations for that offense had expired when Payne was charged with it in 1986:

> The instant crimes occurred on December 17, 1981. The applicable statute of limitations for conspiracy was two years. 42 Pa.C.S. § 5552(a). On December 14, 1984[,] 42 Pa.C.S. § 5551 was amended to provide that if a murder occurred then there is no statute of limitations regarding a conspiracy charge. The amendment did not apply to [Payne] since his crimes occurred three years prior to the amendment. [Payne] was not

---

[6] Post Conviction Relief Act (PCRA), 42 Pa.C.S. § 9541 *et seq*.

[7] Payne was convicted of robbery in an unrelated case.

charged until January, 1986 with the instant crimes. Hence, the statute of limitations had run on the conspiracy charge. His trial counsel was ineffective for failing to raise this issue and we find that the [PCRA] court erred in finding that counsel was effective.

*Id.* at 9. This Court also found that double jeopardy barred Payne's sentence for burglary, as he had already been convicted and sentenced for felony murder. *Id.* at 16. On remand, the trial court resentenced Payne, on July 5, 1994, for the unrelated robbery conviction.[8]

On June 14, 2012, Payne filed a *pro se* motion/petition titled "Post Conviction Relief Act petition seeking DNA testing pursuant to 42 Pa.C.S. § 9543.1" (hereinafter, "Payne's Petition for DNA Testing" or "the Petition").[9] The trial court[10] appointed counsel to represent him, and a hearing was held

_____

[8] While acknowledging that Payne's sentences for conspiracy and burglary had been vacated and declining (correctly) to reimpose sentence for those offenses, the trial court failed to acknowledge that Payne's sentence for conspiracy had not merely been vacated—the conviction itself had been reversed by this Court's April 30, 1993 memorandum. *See* Order, 7/5/94, at 2.

[9] Payne provided documentary evidence to the trial court, in the form of a prison postage slip dated February 9, 2012, demonstrating that he attempted to file the Petition on that date. However, that earlier petition was not docketed in the lower court. Numerous *pro se* letters from Payne subsequently appear in the docket prior to the June 14, 2012 refiling, in April, May, and early June of 2012, although those letters have not been preserved by the clerk of courts in the certified record. The trial court does not address this matter in its Pa.R.A.P. 1925(a) opinion; however, the court proceeded as if Payne's petition was timely filed, and the Commonwealth does not contend otherwise in its brief to this Court.

[10] This and all subsequent references to the "trial court" refer to the court that received and ruled upon Payne's Petition for DNA Testing unless otherwise specified.

on the matter on February 19, 2013. Subsequently, on May 23, 2013, the trial court issued an order granting Payne's Petition for DNA Testing. The Commonwealth filed a timely notice of appeal from that order and filed a timely, court-ordered Pa.R.A.P. 1925(b) statement of errors complained of on appeal. The trial court issued its Rule 1925(a) opinion on August 15, 2013.

The Commonwealth's appeal was initially heard by a three-judge panel of this Court. In an unpublished memorandum, a majority of the panel affirmed on the basis of the trial court's Rule 1925(a) opinion, holding that the trial court's order granting DNA testing was supported by the evidence of record and free of legal error. The panel majority also opined that the trial court was presented with factors militating both in favor of and against DNA testing under the applicable standard, and the court had reasonably applied its discretion to grant testing in the circumstances of this case. *See In re: John Marshall Payne, III*, 1113 MDA 2013 (Pa. Super. filed October 3, 2014) (unpublished memorandum) (withdrawn by order granting *en banc* review on December 16, 2014). One judge dissented, agreeing with the Commonwealth that the jury's verdict could withstand any possible result of DNA testing. *Id.* (J. Bowes dissenting). The Commonwealth subsequently filed a timely request for *en banc* argument, which was granted by *per curiam* order dated December 16, 2014. As a result of that order, the October 3, 2014 memorandum decision was withdrawn. Oral argument before the instant *en banc* panel occurred on June 29, 2015.

The Commonwealth now presents the following question for our review:

> Whether the court below erred as a matter of law in determining that DNA testing would produce exculpatory evidence that would establish [Appellee]'s actual innocence?

Commonwealth's Resubmitted Brief ("Commonwealth's Brief"), 6/30/15, at 4 (unnecessary capitalization omitted).

"Post conviction DNA testing falls under the aegis of the [PCRA],[11] and thus, '[o]ur standard of review permits us to consider only whether the

_____

[11] Nevertheless, as this Court explained in **Commonwealth v. Williams**, 35 A.3d 44 (Pa. Super. 2011), the PCRA's jurisdictional time-bar does not preclude a request for DNA testing made pursuant to Section 9543.1:

> An application for DNA testing should be made in a motion, not in a PCRA petition. **Commonwealth v. Weeks**, 831 A.2d 1194, 1196 (Pa. Super. 2003). Though brought under the general rubric of the PCRA, motions for post-conviction DNA testing are "clearly separate and distinct from claims brought pursuant to other sections of the PCRA." **Commonwealth v. Perry**, 959 A.2d 932, 938 (Pa. Super. 2008). This Court has consistently held the one-year jurisdictional time bar of the PCRA does not apply to motions for DNA testing under Section 9543.1. **Commonwealth v. Conway**, 14 A.3d 101, 108 n.2 (Pa. Super. 2011), *appeal denied*, … 29 A.3d 795 ([Pa.] 2011); **Perry**, *supra* at 938; [**Commonwealth v.**] **Brooks**, [875 A.2d 1141, 1146 (Pa. Super. 2005)]. Another distinction of motions for DNA testing is that Section 9543.1 does not confer a right to counsel. **Brooks**, *supra* at 1147.

**Williams**, 35 A.3d at 50. Furthermore, Section 9543.1(f)(1) states:

> After the DNA testing conducted under this section has been completed, the applicant may, pursuant to section 9545(b)(2) (relating to jurisdiction and proceedings), during the 60-day period beginning on the date on which the applicant is notified of

*(Footnote Continued Next Page)*

PCRA court's determination is supported by the evidence of record and whether it is free from legal error.'" ***Conway***, 14 A.3d at 108 (quoting ***Brooks***, 875 A.2d at 1144). Additionally, where "the resolution of this appeal involves statutory construction, which involves a pure question of law, we review that aspect of the trial court's decision *de novo* and our scope of review is plenary." ***Id.*** Moreover, "the DNA testing statute, which was passed unanimously by the Pennsylvania General Assembly, should be regarded as a remedial statute and interpreted liberally in favor of the class of citizens who were intended to directly benefit therefrom, namely, those wrongly convicted of a crime." ***Id.*** at 113.

The pertinent statutory language at issue is as follows:

**(a) Motion.--**

(1) An individual convicted of a criminal offense in a court of this Commonwealth and serving a term of imprisonment or awaiting execution because of a sentence of death may apply by making a written motion to the sentencing court for the performance of forensic DNA testing on specific evidence that is related to the investigation or prosecution that resulted in the judgment of conviction.

(2) The evidence may have been discovered either prior to or after the applicant's conviction. The evidence shall be available for testing as of the date of the motion. If the evidence was discovered prior to the applicant's conviction, the evidence shall not have been subject to the DNA testing requested because the technology for testing was

*(Footnote Continued)* ───────────────

the test results, petition to the court for postconviction relief pursuant to section 9543(a)(2)(vi) (relating to eligibility for relief).

not in existence at the time of the trial or the applicant's counsel did not seek testing at the time of the trial in a case where a verdict was rendered on or before January 1, 1995, or the applicant's counsel sought funds from the court to pay for the testing because his client was indigent and the court refused the request despite the client's indigency.

…

**(c) Requirements.--**In any motion under subsection (a), under penalty of perjury, the applicant shall:

(1) (i) specify the evidence to be tested;

(ii) state that the applicant consents to provide samples of bodily fluid for use in the DNA testing; and

(iii) acknowledge that the applicant understands that, if the motion is granted, any data obtained from any DNA samples or test results may be entered into law enforcement databases, may be used in the investigation of other crimes and may be used as evidence against the applicant in other cases.

(2) (i) assert the applicant's actual innocence of the offense for which the applicant was convicted;

…

**(d) Order.--**

(1) Except as provided in paragraph (2), the court shall order the testing requested in a motion under subsection (a) under reasonable conditions designed to preserve the integrity of the evidence and the testing process upon a determination, after review of the record of the applicant's trial, that the:

(i) requirements of subsection (c) have been met;

(ii) evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been altered in any material respect; and

(iii) motion is made in a timely manner and for the purpose of demonstrating the applicant's actual innocence and not to delay the execution of sentence or administration of justice.

(2) The court shall not order the testing requested in a motion under subsection (a) if, after review of the record of the applicant's trial, the court determines that there is no reasonable possibility that the testing would produce exculpatory evidence that:

(i) would establish the applicant's actual innocence of the offense for which the applicant was convicted; …

42 Pa.C.S. § 9543.1 ("DNA Statute").

The sole issue presented for our review concerns the application of the standard set forth in Section 9543.1(d)(2) and 9543.1(d)(2)(i).[12] Stated

_____

[12] President Judge Gantman, writing in dissent, believes that we cannot reach this question because Payne "failed to establish the statutory timeliness of his petition as mandated by the DNA statute at 42 Pa.C.S.A. § 9543.1(d)(1)(iii) and our Supreme Court's decision in *Commonwealth v. Edmiston*, 619 Pa. 549, 65 A.3d 339 (2013)…." Dissenting Opinion (Gantman, P.J.), at 1. Notably, the Commonwealth has never asserted the untimeliness of Appellee's DNA testing petition based on Section 9543.1(d)(1)(iii) or *Edmiston*. It is certainly true that, with respect to the general timeliness provisions set forth in Section 9545(b) of the PCRA, this Court may raise, *sua sponte*, issues concerning the timeliness of a PCRA petition because "[t]he time requirements established by the PCRA are jurisdictional in nature; consequently, Pennsylvania courts may not entertain untimely PCRA petitions[,]" and "[w]hether [a petitioner] has carried his burden is a threshold inquiry prior to considering the merits of any claim." *Edmiston*, 65 A.3d at 346. However, neither the *Edmiston* decision, nor any other decision by a Pennsylvania Court to our knowledge, has ever referred to the timeliness requirements of Section 9543.1(d)(1)(iii) as being jurisdictional in nature, including the *Edmiston* decision itself. Simply put, the notion that the PCRA's timeliness requirements are jurisdictional in nature refers exclusively to the timeliness provisions of Section 9545(b), and not to the separate matter of timeliness as set forth in Section 9543.1(d)(1)(iii).

This Court has previously discussed the relationship between the PCRA's jurisdictional time-bar and the DNA-testing provisions as follows:

*(Footnote Continued Next Page)*

- 15 -

────────────────

> As we noted in ***Commonwealth v. Weeks***, 831 A.2d 1194, 1196 (Pa. Super. 2003), "Post conviction DNA testing does not directly create an exception to § 9545's one-year time bar. ***See*** 42 Pa.C.S.A. § 9543.1. Rather it allows for a convicted individual to first obtain DNA testing which could then be used within a PCRA petition to establish new facts in order to satisfy the requirements of an exception under 42 Pa.C.S.A. § 9545(b)(2). ***See*** 42 Pa.C.S.A. § 9543.1(f)(1)." ***Accord Commonwealth v. Scarborough***, [619] Pa. [353], 64 A.3d 602, 609 (2013) ("the litigation of a motion for DNA testing under Section 9543.1 is, in substance, a wholly separate proceeding from litigation of a PCRA petition[]"); ***Commonwealth v. Williams***, 35 A.3d 44, 50 (Pa. Super. 2011) ("This Court has consistently held the one-year jurisdictional time bar of the PCRA does not apply to motions for DNA testing under Section 9543.1.").

***Commonwealth v. Gacobano***, 65 A.3d 416, 419 (Pa. Super. 2013) (footnote omitted).

In ***Edmiston***, our Supreme Court conducted a thorough jurisdictional-timeliness analysis of Edmiston's multiple PCRA petitions, but did not include in that discussion any reference to Section 9543.1(d)(1)(iii). ***See Edmiston***, 65 A.3d at 345-353. After completing their analysis of Section 9545(b) issues, the Court then separately considered "[the a]ppellant's motion for post-conviction DNA testing pursuant to 42 Pa.C.S. § 9543.1." ***Id.*** at 353. The Court noted that "the PCRA court first rejected the Commonwealth's argument that [the a]ppellant's petition was untimely under Section 9543.1(d)(1)(iii)…." ***Id.*** at 355. Thus, clearly the issue of timeliness with respect to Section 9543.1(d)(1)(iii) had been preserved in the PCRA court by the Commonwealth. Later, the Court referenced that Section 9543.1(d)(1)(iii) was "implicated by the Commonwealth's argument in this case[,]" strongly suggesting that the timeliness of the appellant's DNA petition pursuant to Section 9543.1(d)(1)(iii) was raised by the Commonwealth *on appeal*.

The ***Edmiston*** Court went on to hold that:

> Although the PCRA court did not make the requisite finding of timeliness, we see no need to remand for the court to do so because, as explained below, our own review of the record and

briefly, the interplay between these provisions requires that DNA testing

"shall not" be ordered by the PCRA court if there is "no reasonable possibility

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯

> circumstances surrounding Appellant's post-conviction DNA testing request leads to the conclusion that this motion was untimely as a matter of law and was forwarded only to delay further the execution of the sentence.

*Id.* at 357.

The above passage *does not* indicate that the Supreme Court addressed the timeliness of Edmiston's DNA-testing petition *sua sponte*, nor does it suggest that review of timeliness under Section 9543.1(d)(1)(iii) is a threshold, jurisdictional matter akin to the provisions of Section 9545(b). Instead, it is clear from the context of the decision that the **Edmiston** Court was responding to a specific argument raised by the Commonwealth on appeal that had been preserved before the PCRA court. The PCRA court had not addressed the timeliness of Edmiston's DNA-testing petition under Section 9543.1(d)(1)(iii), despite the Commonwealth's arguments specifically addressing that provision. Instead, the court denied Edmiston's DNA-testing petition on unrelated, "then-governing Superior Court precedent[,]" which was reversed by the Supreme Court *after* the PCRA court issued its order. **Id.** at 355.

In the present case, however, the PCRA court never addressed timeliness under Section 9543.1(d)(1)(iii) because the Commonwealth never raised the matter below. In any event, the Commonwealth, before us now as Appellant in this case, does not even present such a claim in their appeal. Consequently, the matter has clearly been waived. **See** Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). Indeed, even if the Commonwealth had no affirmative burden to directly raise this matter before the PCRA court in objection to Payne's Petition for DNA Testing, it certainly bore the burden of raising the Section 9543.1(d)(1)(iii) issue in its Rule 1925(b) statement, which it did not do. **See Commonwealth v. Lord**, 719 A.2d 306, 309 (Pa. 1998) ("Any issues not raised in a 1925(b) statement will be deemed waived."). Given that we have no precedential authority that the requirements of Section 9543.1(d)(1)(iii) are jurisdictional in nature, or otherwise involve the illegality of a sentence, we may not raise such matters *sua sponte*, as President Judge Gantman suggests in her Dissenting Opinion.

that the testing would produce exculpatory evidence" that "would establish … actual innocence of the offense for which the applicant was convicted."

Section 9543.1 frequently incorporates, yet fails to define, the term "actual innocence."  In **Conway**, 14 A.3d at 109, this Court applied a definition of 'actual innocence' taken from "the United States Supreme Court in its Opinion in **Schlup v. Delo**, 513 U.S. 298, 327 [] (1995), namely, that the newly discovered [DNA] evidence must make it 'more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt.'"

Payne filed a *pro se* petition pursuant to Section 9543.1(a)(1) seeking DNA testing of several items collected from the scene of the December 1981 killing of Rishel.  Specifically, Appellant sought testing of the following items, which have been retained and preserved by the F.B.I.:

- Brown head hairs exhibiting Caucasian characteristics found on Rishel's bedsheet and nightgown, which the F.B.I. determined did not  match the victim.

- Numerous blood samples taken from various locations in Rishel's bed and bedroom.

- One brown pubic hair, exhibiting Caucasian characteristics, found on a blanket on the victim's bed.

Payne's Petition for DNA Testing, at 10 ¶ 10.

The trial court ultimately granted Payne's "request to perform DNA testing on the evidence listed" in the Petition.  Trial Court Opinion (TCO), 5/22/13, at 2.  In reaching that conclusion, the trial court dismissed the notion that the failure to match Payne's DNA to the tested materials would

demonstrate his innocence. *Id.* at 9 ("It is entirely possible, through luck or concealment, that [Payne] left no DNA behind."). However, the court recognized that Payne's Petition for DNA Testing was not limited to that theory. Payne also presented a "data bank" theory as a basis for testing, as discussed in *Conway*. This theory "postulates that any DNA results that are obtained from DNA testing that prove the presence of an unknown person could be run through state and federal data banks for a match, which, if successful, would lead to the identification of a separate assailant[.]" *Conway*, 14 A.3d at 110.

Assuming exculpatory results under this "data bank" theory, *i.e.*, the discovery of a heretofore unknown assailant, the trial court next considered whether such results might demonstrate Payne's actual innocence. The trial court found that such a determination "turns upon the nature of the evidence offered at trial." TCO, at 10. After analyzing the weight of the trial evidence demonstrating guilt, the trial court concluded that "[a] jury might indeed have placed more emphasis on the weaknesses of [the] Commonwealth's case if there were DNA evidence introduced and it did not directly tie [Payne] to the murder scene." *Id.* at 12.

The trial court then went on to offer a secondary, policy-based reason to conduct DNA testing in this case:

> Considering all of the above that is both for and against testing, the very best reason to test the evidence is the fact that the witnesses who testified regarding confessions all agreed on one salient point, namely, that there were three individuals who perpetrated the robbery that night. As such, DNA testing, in this

case, may result in additional charges and bringing to justice all guilty parties. Perhaps it would be a perversion of the PCRA statute, as it relates to DNA, if [Payne]'s request were to be granted, under the auspices of a statute designed to aid the wrongly convicted, in order to further [the] Commonwealth's own interests. However, it is curious indeed that [the] Commonwealth's position at [Payne]'s trial was that there were three intruders into the victim's home, but that no testing should be done on available evidence when two of those intruders remain unknown and potentially on the loose. In point of fact, were the Commonwealth to appeal a ruling in favor of testing it might be inadvertently aiding other perpetrators to escape culpability.

TCO, at 12-13.

Presently, the Commonwealth argues that the trial court erred in granting Payne's Petition for DNA Testing:

In the instant case, [Payne] advanced two arguments in the court below for establishing his actual innocence: (1) there will be a lack of DNA evidence tying [him] to the murder, and such absence of evidence will prove that he was not present at the crime scene; and (2) DNA testing will establish the identity of the actual assailant thereby eliminating [Payne] as the assailant. The Commonwealth maintains that both arguments are flawed and do not mandate the granting of DNA testing.

Commonwealth's Brief, at 19.

The first scenario addressed by the Commonwealth concerns a potential result of DNA testing that merely demonstrates the absence of Payne's DNA in the tested materials. The Commonwealth argues that such a result—the mere absence of the accused's DNA—would never justify DNA testing under Section 9543.1. We agree with the Commonwealth that this Court has routinely held that the absence of the accused's DNA, *by itself*, cannot satisfy Section 9543.1(d)(2)(i)'s "actual innocence" standard.

- 20 -

For instance, in **Commonwealth v. Heilman**, 867 A.2d 542, 547 (Pa. Super. 2005), the victim, Tamara Scott, died in 1987 from three gunshot wounds to her head. **Id.** at 543. Initially, Heilman and Jerry Dixon told police that Alex Dean had killed her. **Id.** Later, Dixon recanted his statement, and revealed that he and [Heilman] concocted the story blaming Mr. Dean while Heilman and Dixon were incarcerated together in the Allegheny County Jail[.]" **Id.** The "true" story, Dixon testified, was that while "acting as [a] jitney driver, [Dixon] took [Heilman] and Ms. Scott, who was a prostitute picked up by [Heilman] in the downtown section of the city, to a parking lot on the northside of the city. [Heilman] and Ms. Scott exited the vehicle and went behind a building. A short time later, Mr. Dixon heard gun shots and [Heilman] returned to the vehicle alone." **Id.** at 544. [Heilman] was convicted of criminal homicide and gun charges. For those offenses, Heilman was sentenced in 1990.

In 2003, Heilman appealed from the trial court's denial of his motion for DNA testing filed pursuant to Section 9543.1. On appeal, this Court noted that Heilman's "entire argument depend[ed] on th[e] premise" that "an absence of DNA evidence would conclusively absolve him of culpability." **Id.** at 545. Specifically, Heilman argued that "'[t]he killer obviously beat the victim about her face and then shot her at close range' and 'obviously had sex with her ... before he killed her,'" and thus Heilman "insist[ed] that if he had murdered the victim, 'his DNA would have been all over that crime scene (including the victim's body and her clothing).'" **Id.** at 546. However,

the trial court rejected his argument, noting that even if semen not belonging to Heilman were found in any of the evidence collected from the victim or her clothing, the fact that the victim was a prostitute precluded such evidence from effectively demonstrating Heilman's "actual innocence."

*Id.*

This Court agreed and affirmed the trial court's denial of Heilman's request for DNA testing, reasoning:

> Although we have already acknowledged … the paucity of precedent on the question presented, that does not free Heilman from the obligation to provide more than a bald assertion based on an unintuitive scientific premise. On its face, the *prima facie* requirement set forth in § 9543.1(c)(3) and reinforced in § 9543.1(d)(2) requires an appellant to demonstrate that favorable results of the requested DNA testing "would establish" the appellant's actual innocence of the crime of conviction. Heilman has failed to make such a demonstration, nor could he. In DNA as in other areas, an absence of evidence is not evidence of absence. Furthermore, a murder suspect may be convicted on wholly circumstantial evidence, of which there was plenty in this case.

*Id.* at 546-47. There was no evidence that Scott's killer had intercourse with her prior to shooting her three times in the head, nor was there evidence that Scott struggled with her assailant before she was killed. Thus, the absence of Heilman's DNA in, on, or about the victim's body and/or the crime scene was inconsequential in the context of the facts supporting his conviction in that case.

Similarly, in **Commonwealth v. Smith**, 889 A.2d 582, 586 (Pa. Super. 2005), we stated that "the absence of [the] appellant's DNA [in or on

- 22 -

the evidence to be subjected to testing] cannot be meaningful and cannot establish his actual innocence of the murder." Smith sought Section 9543.1 DNA testing of his victim's fingernails, hoping to demonstrate the absence of his own DNA or the presence of another's. However, there was "no evidentiary basis on which to infer that any DNA detected on the victim's fingernails was deposited there by her assailant during the fatal attack." *Id.* at 585. Thus, the absence of Smith's DNA could not be meaningful where he could not establish any evidentiary basis upon which to believe that the victim's assailant's DNA *should* be in, on, or about the evidence available for testing.

In **Brooks**, the appellant was convicted of killing the victim, Ethel Mumma, who was shot in the head and stomach. **Brooks**, 875 A.2d at 1146. In his Section 9543.1 petition, Brooks sought testing of "blood found on any of the blood stained material, including hair fibers or skin tissue which may have been found or [were] found on the victim or victim's clothing." *Id.* However, no evidence of record supported the contention that the perpetrator had left behind biological material. *Id.* at 1147. Relying on **Heilman**, the **Brooks** Court concluded that "even if [the] appellant's DNA was not at the crime scene, it would prove nothing." *Id.*

Thus, as **Heilman**, **Smith**, and **Brooks** demonstrate, this Court has consistently held that the absence of a petitioner's DNA, *by itself*, cannot demonstrate "actual innocence" for purposes of Section 9543.1(d)(2)(i). Yet, the quantum of evidence necessary to satisfy Section 9543.1(d)(2)(i)

above and beyond the absence of the petitioner's DNA has never been explicitly defined.[13]  In this regard, we are not aware of any authority that holds or suggests that demonstration of "actual innocence" under Section 9543.1(d)(2)(i) *requires* a discovery of DNA from someone other than the petitioner.  Instead, the quantum of evidence necessary to satisfy Section 9543.1(d)(2)(i) above and beyond the absence of the petitioner's DNA has been, and should continue to be, determined on a case-by-case basis, as circumstances dictate.  Such circumstances might include the presence of another person's DNA, but not necessarily so.  It is at least conceivable that certain circumstances or facts, in addition to or in conjunction with the absence of the petitioner's DNA in a particular location, may satisfy Section 9543.1(d)(2)(i).[14]  However, to the extent that the Commonwealth asserts that the absence of Payne's DNA on the items to be tested would not, by

---

[13] In most circumstances, the presence of a petitioner's DNA in the tested evidence will have an inculpatory effect.  However, it would be improper to state any absolute rule, as it is plausible that the presence of a petitioner's DNA in, on, or about specific evidence could serve an exculpatory purpose in rare circumstances, such as where the presence of the petitioner's DNA in one location (and deposited at a certain time) would make it impossible for the petitioner to be present to commit a crime at a different location.

[14] We alluded to such circumstances in **Brooks**, noting:  "This is not a rape-murder case where the absence of the defendant's semen could prove his innocence; or a case where there were signs of a struggle and the perpetrator left behind skin, hair, or blood samples."  **Brooks**, 875 A.2d at 1147.  The absence of DNA evidence in a location where it is reasonably expected to be found has profoundly different implications than does the failure to discover DNA evidence in a location where no such reasonable expectation can be articulated.

itself, establish a *prima facie* case that he is actually innocent, we agree. Additionally, there are no circumstances in this case that, in combination with the absence of Payne's DNA in a specific location, would demonstrate his actual innocence.

However, Payne did not merely suggest in the Petition that the absence of his DNA on the items to be tested would, by itself, demonstrate his actual innocence of the crime for which he was convicted. While he does assert that the absence of his DNA would be exculpatory, he also asserts that DNA testing might reveal the identity of the person who actually killed the victim. Payne's Petition for DNA Testing, at 4-5 ¶ 2 ("Here, Petitioner John Payne asserts that the requested DNA evidence would show the absence of his DNA but Petitioner Payne says more. Petitioner avers that comparison of the DNA profile to state and national databases would reveal the identity of the likely killer.") (emphasis omitted).

The Commonwealth argues Payne's "data bank" theory still fails to meet his burden under the DNA Statute because he was convicted as a member of a conspiracy to burglarize the victim's home. In this regard, the Commonwealth contends that "[a]ny evidence produce by DNA testing that revealed the presence of a person other than [Payne] at the crime scene would not establish [Payne]'s innocence because inherent in the juror's verdict was a finding that there were others besides [Payne] who were involved in the killing of Elsie Rishel." Resubmitted Appellate Brief for the

Commonwealth (hereinafter "Commonwealth's Brief"), at 15. Explaining further, the Commonwealth states:

> [Payne]'s second argument rests on the "data bank" theory discussed in … **Conway**…. In **Conway**, this Court explained that the "data bank" theory rests on the assertion that "that any DNA results that are obtained from DNA testing that prove the presence of an unknown person could be run through state and federal databanks for a match, which, if successful, would lead to the identification of a separate assailant." [**Conway**], 14 A.3d at 110. What [Payne]'s argument overlooks is the fact that [he] was convicted of criminal conspiracy, meaning jurors specifically found that [Payne] acted in concert with other individuals to commit the crime of felony murder. The Commonwealth's theory, supported by three witnesses who testified that [Payne] confessed to committing the killing with two accomplices, was that there were three intruders into the victim's home. Thus, even if DNA testing identified one of [Payne]'s two accomplices, those test results would not establish [Payne]'s actual innocence, because [Payne]'s guilt was predicated on the possibility that evidence linking others to the scene might exist. The court below rejected that aspect of [Payne]'s argument, too….

Commonwealth's Brief, at 20-21.

We disagree. The Commonwealth's theory, despite significantly narrowing the array of potentially exculpatory results from DNA testing, is not completely dispositive of Payne's request for DNA testing, as discussed below. First, the applicability of the Commonwealth's theory to the instant case is questionable since this Court reversed Payne's conviction for conspiracy in 1993. *See Commonwealth v. John M. Payne*, No. 00581 Harrisburg 1992, unpublished memorandum at 9-10 (Pa. Super. filed April 30, 1993) (finding trial counsel ineffective for failing to seek to quash the conspiracy charge due to the then-in-effect statute of limitations). As such,

it is simply disingenuous for the Commonwealth to rely upon the jury's specific findings regarding Payne's participation in a conspiracy when Payne's conviction for that crime was overturned after that verdict was issued. Furthermore, if the Commonwealth were to retry Payne in this case, it will be precluded from charging him with conspiracy on double jeopardy grounds. Thus, the Commonwealth's theory—that the identification of an unexplainable DNA profile in the tested evidence would not serve to demonstrate Payne's actual innocence *because of his conspiracy conviction*— appears to fail on its face in the context of this case. Moreover, the Commonwealth has simply not offered any basis upon which to suggest that this Court can simply ignore that Payne's conspiracy conviction no longer stands.

Second, even if Payne's conspiracy conviction survived, the Commonwealth's claim must fail.[15] The Commonwealth's argument too narrowly construes the nature of Payne's claim of innocence, in effect suggesting that Payne is only challenging his conviction for murder, but not his culpability as an accomplice or a co-conspirator to burglary. However,

---

[15] We provide an alternative analysis out of an abundance of caution. Although the "actual innocence" standard is not to be taken literally, it is apparent that Payne's conviction for conspiracy was not reversed on its merits, but instead due to the Commonwealth's failure to try him within the then-applicable statute of limitations. Furthermore, Payne might have been convicted of second-degree murder as an accomplice to the underlying burglary even in the absence of a conspiracy conviction.

Payne has asserted his actual innocence for all offenses for which he was convicted in this case. The Commonwealth argues that Payne can never demonstrate actual innocence because of his conspiracy and/or accomplice-to-burglary convictions, but fails to explain why or how those underlying offenses are immune from scrutiny given certain exculpatory DNA results (notwithstanding the fact that Payne's conviction for conspiracy has already been overturned). Payne has maintained consistently that, not only did he not kill Rishel, but that he was not a participant in the burglary of her home. Without a doubt, results of DNA testing that merely show that Payne did not leave his DNA at the crime scene, in the absence of any other evidence, would not entitle him to a new trial. However, the question before the trial court was whether to grant Payne's Petition for DNA Testing, which demands an inquiry into whether there is "no reasonable possibility that the testing would produce exculpatory evidence to establish petitioner's actual innocence[,]" **Smith**, 889 A.2d at 584, not whether a particular result, or category of results, would entitle him to a new trial. As discussed below, the Commonwealth appears to consider only potential results of DNA testing that are, in the context of the specific facts of this case, not exculpatory. However, the statute itself dictates that the trial court *assume* exculpatory results in evaluating a petition for DNA testing. **Conway**, 14 A.3d at 110 ("[T]he statutory language requires reviewing courts to evaluate the 'actual innocence of the offense' component by 'assuming exculpatory results' will be obtained from the proposed testing."); 42 Pa.C.S. § 9543.1(c)(3)(ii).

Third, the Commonwealth does not adequately explain why DNA testing that shows an unexplained DNA profile (or profiles) in the victim's bed would only serve to attack Payne's identity as the actual killer, but not his identity as a co-conspirator or accomplice to the crime of burglary. It is not beyond the realm of imagination that certain results could also undermine the Commonwealth's theory that Payne acted as an accomplice. Here, the most powerful evidence of Payne's guilt of all offenses was his purported confessions to Wallick, Oglesby, and Gibson. Through the testimony of those three individuals, it was established that Payne had acted with the help of two accomplices or co-conspirators, but no independent physical or circumstantial evidence of multiple burglars corroborates their testimony. Wallick was unaware of the accomplices' names, but believed that Payne had told her the accomplices were two men. Payne purportedly told Oglesby that his accomplices were a man named Danny Edwards and Payne's ex-girlfriend, Melody. Gibson's testimony established that Payne had two accomplices, one of which was named "Danny."

Thus, there are a limited number of potential DNA profiles that would tend to outright support the Commonwealth's case against Payne. First, and most obviously, would be the discovery of Payne's DNA profile in the evidence to be tested. Second, discovery of the DNA profile of Danny Edwards and/or "Melody" would, in the context of the Commonwealth's evidence, not tend to prove Payne's actual innocence. Third, if testing of the head and pubic hairs results in matches to the victim's close relatives, or

other persons with routine access to her home, such evidence would also be difficult to construe as exculpatory.[16]

However, these scenarios are not the only possible results of DNA testing. It is not difficult to imagine, however unlikely, results that could deal a devastating blow to the soundness of the jury's verdict in this case, including whether or not there were multiple burglars—a fact entirely dependent on the credibility of Wallick, Oglesby, and Gibson. If testing were to reveal the DNA profiles of Wallick, Oglesby, and/or Gibson, such results would not only be exculpatory, but could serve to completely undermine the Commonwealth's case against Payne. Similarly, if the DNA results were to match some heretofore unknown culprit with a history of burglary-murders which bear a striking resemblance to the killing of Rishel, and further investigation reveals that person had the opportunity to commit this crime, such results could easily allow Payne to demonstrate the unreliability of the jury's verdict *in toto*.[17] The Commonwealth's argument, while internally

_____

[16] The Commonwealth might find it more difficult to explain the presence of a close relative's DNA profile in the blood samples taken from Rishel's bed.

[17] There were some facts in this case that tended to support a theory that there was a single individual responsible for the murder of Rishel and the burglary of her residence. For instance, there was only one set of footprints in the snow leading to the broken window that was assumed to be the point of the illegal entry into her home. There was only one set of footprints left in the snow leading away from Rishel's home. The *only* evidence of multiple culprits derives from Payne's purported confessions to Wallick, Oglesby, and Gibson. Not only is there an absence of physical evidence connecting Payne to these crimes, there is an absence of any evidence demonstrating that
*(Footnote Continued Next Page)*

consistent given a relatively narrow scope of potential outcomes considered, simply ignores other potential outcomes that could permit Payne to demonstrate a *prima facie* case that he is actually innocent.

We must emphatically state that, with respect to the burden on a Section 9543.1 petitioner, "no reasonable probability" does not mean, "no likely probability." It should go without saying that the most *likely* result of Section 9543.1 DNA testing will corroborate a petitioner's guilt, confirm it outright, or simply fail to cast significant doubt on the verdict. However, the very purpose of Section 9543.1 must be to afford a petitioner the *opportunity* to demonstrate the unlikely.[18] The threshold question is, therefore, not the likelihood of proof of innocence, but whether it is within

*(Footnote Continued)* _____

these crimes were committed by more than one person apart from Payne's purported confessions to Wallick, Oglesby, and Gibson.

[18] The experiences of *Amici Curiae*, The Pennsylvania Innocence Project, and The Innocence Project, emphasize this point. Since 1989, *Amici Curiae* report that "at least 329 wrongfully convicted people have been exonerated and released from prison on the strength of post-conviction DNA testing." Brief of *Amici Curiae*, at 8-9 (footnote omitted). "Many of the 329 DNA exonerees were convicted on evidence far more "overwhelming" than that used to convict Mr. Payne; yet through DNA testing those men and women were able to show to a scientific certainty they were not guilty of the crimes for which they were convicted." *Id.* at 9. In nearly half of those cases, DNA testing resulted in identification of the actual perpetrator. *Id.* As is particularly pertinent to the present case, "in about 25% of DNA exoneration cases, innocent defendants made incriminating statements, delivered outright confessions, or pled guilty. Additionally, incentivized testimony— including particular incentives that are not disclosed to the jury—were critical evidence used to convict an innocent person in more than 15% of wrongful conviction cases." *Id.* at 10 (footnotes omitted).

the realm of reason that some result(s) could prove innocence. In **Heilman**, **Smith**, and **Brooks**, this Court sensibly determined that it was simply not reasonable to believe that any DNA test results, even those presumed to be exculpatory, could demonstrate a *prima facie* case of actual innocence of those Section 9543.1 petitioners.

In **Conway**, by contrast, this Court reached a different result. Conway was convicted of stabbing Michele Capitano to death in 1986. Stated briefly, on the day of the murder, Conway left his home to run some errands for himself and his wife. He returned home 90 minutes later and told his wife he had discovered a body at a local surgical supply store. The victim had been raped and murdered. Conway told her that he attempted to untie the bound victim, but after failing in that attempt, he returned home before notifying authorities of his gruesome discovery. Conway was charged and ultimately convicted of killing Capitano based upon numerous suspicious circumstances. Years later, Conway sought testing under Section 9543.1 of several items preserved from the crime scene.[19] The trial court denied his request, but this Court reversed that decision on appeal.

_____

[19] Conway sought testing of:

> [B]lood-stained paper towels found near the victim, fingernail clippings from the victim's hands, a piece of blue cloth that had been tied around the victim's hands; rape kit samples; the victim's blood-stained lab coat, the victim's blood-stained dress, the victim's blood[-]stained half slip, the victim's blood-stained

*(Footnote Continued Next Page)*

With regard to its analysis under Section 9543.1, the **Conway** Court pointed to the following "salient" facts:

- [Conway] was convicted solely on circumstantial evidence.

- [Conway] does not deny that he was present at the murder scene—in fact he claims to have discovered the body, and subsequently advised his wife to report the crime to the police.

- [Conway], on the day of the homicide, provided a statement to the police in which he admitted touching the body of the deceased victim for the purpose of determining whether she was alive.

- The Commonwealth did not introduce any DNA or other scientific evidence tying [Conway] to the body of the victim or the location—specifically the bathroom—where the body was discovered.

**Conway**, 14 A.3d at 109.

Conway advanced three theories of why DNA testing was warranted under Section 9543.1:

(1) a "redundancy" theory, which postulates that if the individual DNA tests reveal evidence of a third person on multiple items connected with the crime, then those "redundant" results would give rise to an inference of a separate assailant; (2) a "data bank" theory, which postulates that any DNA results that are obtained from DNA testing that prove the presence of an unknown person could be run through state and federal data banks for a match, which, if successful, would lead to the identification of a separate assailant; and (3) a "confession" theory, which postulates that an assailant who is discovered by

*(Footnote Continued)* ————————

brassiere, the victim's pantyhose, and the victim's purse and contents thereof.

**Conway**, 14 A.3d at 107-08.

using the data bank theory could, when confronted with the DNA evidence, confess to the crime.

*Id.* at 110.

The Commonwealth countered that testing would be inappropriate because 1) "any results produced by DNA testing would be too 'speculative,'" and 2) the "overwhelming" nature of the circumstantial evidence. *Id.* The *Conway* Court quickly rejected the second aspect of the Commonwealth's argument, stating that the "relative weight of the Commonwealth['s] circumstantial evidence would obviously be outweighed by the discovery of relevant DNA evidence constituting substantial direct evidence of the identity of a separate assailant." *Id.*

Next, the *Conway* Court addressed the Commonwealth's speculative-results argument, which included the Commonwealth's assertion that Conway's "data bank" theory had been held in *Smith* to be unavailable to Section 9543.1 petitioners. The *Conway* Court rejected that interpretation of *Smith*. The *Conway* panel instead determined that the *Smith* Court's holding was "clearly grounded in the facts of that case" and was not a precedential foreclosure on all future "data bank" theory claims. *Id.* at 112 ("[T]his Court's perfunctory dismissal of the data bank argument in *Smith*, was not the precedential holding of that case. Rather, it was a *sui generis* rejection of an alternative argument offered by that defendant, and its impact should be confined to the facts and circumstances of that case.")

The ***Conway*** Court went on to examine the specific facts of that case, as well as overarching policy considerations, in concluding that Conway was entitled to DNA testing:

> Here, … the evidence produced at trial, with the exception of the testimony of the jailhouse informant, was wholly circumstantial, and there was no prior history between the parties that would have suggested the occurrence of the violent incident that resulted in the decedent's death.  Moreover, the victim's hands were tied with a cloth that would have most likely been in contact with the assailant's hands, and her clothing was ripped in such a way that indicated extensive contact with the hands of her assailant.  Additionally, the investigators at the scene collected a multitude of sample material from the victim under the belief that she may have had contact with the skin of her assailant.  Thus, there is no question that the development of additional evidence—evidence that can be easily obtained by DNA testing—will add to the reliability of the reconstruction of the events of that tragic day.
>
> The question that we must here confront is whether, in this situation, the Pennsylvania DNA testing statute should be interpreted in such a way as to prevent the comparison of easily obtainable test results with known data banks for the purpose of determining the person responsible for the crime in question.  To pose the question is to provide the answer, for in this evolving world of increased DNA data collections, and the increased reliance thereon by law enforcement agencies, we should not summarily preclude defense counsel from using the data compiled in those "banks" to argue, in appropriate cases, that such evidence establishes the innocence of a person who has been charged or convicted of a crime.  This is especially so since the Act specifically provides for the proactive use of this information by the Commonwealth in an effort to find and prosecute persons whose identities are revealed by this information.

***Id.*** at 112-13.

As was the case in **Conway**, there is a complete lack of physical evidence tying Payne to the crime scene. However, in comparison to **Conway**, there is far less circumstantial evidence suggestive of Payne's guilt than there was circumstantial evidence suggestive of Conway's guilt. The strength of the Commonwealth's case in this matter rested on the credibility of three witnesses to Payne's confessions. Yet, in **Conway**, there was also a jailhouse informant who purportedly overheard Conway admit to killing the victim. All in all, the weight of the evidence in **Conway** demonstrating Conway's guilt appears at least as great, if not greater, than the weight of evidence of Payne's guilt in this matter.[20]

_____

[20] We are not at all dissuaded by the fact that Payne's inculpatory statements included a fact—regarding the use of the telephone as a murder weapon—that was not a fact made public by the investigators. While that fact clearly bolstered the weight of Payne's purported confessions to Wallick, Oglesby, and Gibson, it is not above scrutiny, as this Court's unfortunate experience in **Commonwealth v. Godschalk**, 679 A.2d 1295 (Pa. Super. 1996), demonstrates. In that rape and burglary case, we rejected Godschalk's request for DNA testing because his "conviction rest[ed] largely on his own confession which contain[ed] details of the rapes which were not available to the public." **Godschalk**, 679 A.2d at 1297.

Subsequent DNA testing granted by the federal courts demonstrated the narrow-mindedness of that decision. As *Amici Curiae* explain:

On appeal to federal court, Mr. Godschalk alleged that the Commonwealth violated his constitutional rights by denying him DNA testing. **Godschalk v. Montgomery District Attorney's Office**, 177 F.Supp. 2d 366, 369 (E.D.Pa. 2001). The District Court granted Mr. Godschalk's motion for summary judgment noting,

*(Footnote Continued Next Page)*

As in **Conway**, too, there is clearly some evidence available in this case for testing that could point to the identity of Rishel's assailant. Particularly, the hairs discovered in Rishel's bed are already known not to belong to her. Thus, the facts of the present case appear to offer at least as good an argument for testing as was presented in **Conway**. In this regard, this case bears a far closer resemblance to the facts of **Conway** than it does to **Heilman**, **Smith**, and **Brooks**. Accordingly, we conclude that the trial

_(Footnote Continued)_ ─────────────

> [I]f by some chance no matter how remote, DNA testing on the biological evidence excludes plaintiff as the source of the genetic material from the victims, a jury would have to weigh this result against plaintiff's uncoerced detailed confessions to the rapes. While plaintiff's detailed confessions to the rapes are powerful inculpatory evidence, so to any DNA testing that would exclude plaintiff as the source of the genetic material taken from the victims would be powerful exculpatory evidence. […] Such contradictive results could well raise reasonable doubts in the minds of jurors as to plaintiff's guilt. **Given the well-known powerful exculpatory effect of DNA testing, confidence in the jury's finding of plaintiff's guilt at his past trial, where such evidence was not considered, would be undermined.**

> **Id.** (emphasis added). When that testing took place, the results fully exonerated Mr. Godschalk. The DNA testing revealed that police suggested facts to Mr. Godschalk—whether intentionally or negligently—which bolstered the reliability of his "confession." Mr. Godschalk's exoneration occurred in 2002—the same year the Pennsylvania Legislature passed the DNA Statute.

Brief of _Amici Curiae_, at 8-9 (footnotes omitted).

court's decision to grant DNA testing pursuant to Section 9543.1 was supported by the evidence of record.

The essence of the Commonwealth's claim in this matter is ultimately, therefore, a legal question. The Commonwealth's argument/theory is that based on conspiracy or accomplice-based liability, the presence of another assailant in this case cannot demonstrate Payne's actual innocence. As discussed above, the Commonwealth's argument in this regard is simply overstated. While Appellant's felony murder conviction certainly limits the array of DNA testing results that could assist in proving his innocence, it does not exclude them all. Accordingly, we conclude that the trial court's decision was also free of legal error.

Order **affirmed**.

Judges Panella, Donohue, Shogan, Lazarus and Mundy join this opinion.

President Judge Gantman files a dissenting opinion in which Judge Stabile concurs in the result.

Judge Stabile files a dissenting opinion in which President Judge Gantman concurs in the result.

Judge Allen did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>12/29/2015</u>