J-S03014-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| CLAUDIO SERGIO MANZANET, | |
| Appellant | No. 2852 EDA 2018 |

Appeal from the Order Entered September 12, 2018
In the Court of Common Pleas of Delaware County
Criminal Division at No(s):  CP-23-CR-0004828-1994

BEFORE:  BENDER, P.J.E., OLSON, J., and MUSMANNO, J.

MEMORANDUM BY BENDER, P.J.E.:                **FILED APRIL 10, 2019**

Appellant, Claudio Sergio Manzanet, appeals *pro se* from the post-conviction court's September 12, 2018 order denying his petition for DNA testing under 42 Pa.C.S. § 9543.1 of the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546.  After review, we affirm.

Our Court has previously summarized the facts of Appellant's underlying conviction, as follows:

> Appellant and co-defendant Jorge Fraticelli were convicted and sentenced to life imprisonment for their participation in a double-crossing drug deal gone bad[,] which ended in the death of Matthew DiMaggio. The details of their involvement are as follows. On December 12, 1994, Paul Wayland, a 26 year-old Australian national, arrived in Delaware after a cross-country trip from California to deliver a large quantity of marijuana. Once in Delaware, Wayland contacted Matthew DiMaggio, whom he later met at a local restaurant. Wayland proceeded to DiMaggio's house, where DiMaggio removed most of the packages of marijuana from Wayland's car and made numerous phone calls

arranging a meeting at the Sentinel Motel, Birmingham Township, Delaware County, in order to package and distribute the drugs.

Later that evening, Wayland and DiMaggio drove to the Sentinel Motel, where they met Jeffrey Burger, a 26 year-old who DiMaggio had previously used for distribution of drugs. Before DiMaggio and Wayland had arrived at the motel room, however, Burger telephoned Appellant, whom he knew from drug dealing, to advise Appellant of the opportunity to steal marijuana from DiMaggio. Burger was also acquainted with Fraticelli, Appellant's cousin and co-defendant. A few weeks earlier Burger sold Fraticelli a gun to give to Appellant in exchange for $20.00 and the promise of cocaine.

When DiMaggio and Wayland arrived at the motel, they started to unpack the drugs and discovered that they needed a scale and baggies to properly measure and distribute the marijuana. Burger volunteered to drive to a garage in West Chester where he stored a scale owned by DiMaggio. While at the garage, he locked his keys in the car and called DiMaggio, who came and picked him up and drove Burger to get a second set of keys. After DiMaggio returned Burger to the garage, he retrieved the scale, and drove back to the motel. Burger, however, proceeded to Appellant's apartment, where he met Appellant, Fraticelli, and Appellant's girlfriend, Amy Sortino. While at the apartment, the three men concocted a scheme to rob the drugs from DiMaggio at the motel room. Fraticelli was in possession of the gun that he had previously purchased from Burger.

A short time later, the group left Appellant's apartment; Burger drove his car, followed by Sortino, who was driving Fraticelli's car with Fraticelli and Appellant as passengers. Fraticelli was concerned about his identity, so the two cars stopped at a WaWa convenience store where Burger purchased a hat and pantyhose for Fraticelli.

The four then proceeded to the Sentinel Motel. Burger re-entered the room where DiMaggio and Wayland were weighing pot. About ten minutes later there was a rattling at the door of the motel room. Burger looked out the window and saw Fraticelli wearing the knit cap that he had just purchased and [Appellant] in possession of the gun that he had provided him previously. He then opened the door and looked out as he saw them moving away. Burger reconsidered the situation and stepped back in the room and shut the door. The banging resumed and the door began

to open, then two shots were discharged through the door. At this point Wayland jumped into a closet in the motel room and Burger backed away from the door. The door was then kicked open completely and DiMaggio fell down to the floor behind it. From appearances, the door had struck DiMaggio in the face and possibly broke his nose. [Appellant] entered the room with a gun and told Burger to give him the bag [of marijuana]. A third shot was also discharged. As the assailants departed, it was suggested that the police were already on their way to the premises. Burger, Wayland, and DiMaggio quickly mustered their belongings, loaded them into the vehicles and departed the premises. Wayland took the wheel of DiMaggio's truck as DiMaggio was unable to see. [Burger drove his own vehicle.]

Wayland drove to a gas station and initiated a call to 9-1-1, but then decided to leave DiMaggio, who was lying on the ground, and hitch-hike to a nearby restaurant. Wayland's frantic behavior at the restaurant prompted an employee to call the police, who had just responded to a call from a gas station attendant who reported DiMaggio's presence. When the officers arrived at the gas station, they saw DiMaggio, with a bloodied face, staggering incoherently in circles near his truck. Despite resistance, DiMaggio was transported to the emergency room where it was later determined that he was blinded by a bullet to his left eye. Following brain surgery, DiMaggio died nine days later.

When the officers arrived at the restaurant to question Wayland, he initially denied any knowledge of DiMaggio; however, an anonymous phone call to the pay phone at the restaurant allowed the officers to piece together the situation. The officers interviewed Wayland, who later admitted his relationship with DiMaggio, and explained the circumstances surrounding the shooting. Burger was subsequently connected to the shooting through motel registration and telephone records. Burger, who had been struck in the calf by a bullet during the episode at the motel, did not report the incident to police or seek medical treatment. Ultimately, however, with the assistance of counsel, Burger turned himself into the police and provided detailed statements regarding the Sentinel shooting, implicating himself and the others in the robbery and homicide. Burger later entered open guilty pleas to third degree murder, robbery, and criminal conspiracy. Wayland and Burger both testified for the Commonwealth at trial.

On April 19, 1995, Appellant filed a motion to sever his trial from that of his co-defendants, Fraticelli and Sortino, which was denied by Order dated July 5, 1995. The matter proceeded to a jury trial after which, on July 18, 1995, Appellant and co-defendant Fraticelli were found guilty of, *inter alia*, second[-] degree murder, robbery, possession of an instrument of crime, and criminal conspiracy; co-defendant Sortino was acquitted. Appellant was sentenced on September 26, 1995, to life imprisonment for second[-]degree murder, a consecutive term of three to six years imprisonment for criminal conspiracy, and a concurrent term of six to twenty-four months for carrying a firearm without a license.

*Commonwealth v. Manzanet*, No. 03949 PHL 1995, unpublished memorandum at 1-5 (Pa. Super. filed Nov. 3, 1997) (footnote and citation to record omitted).

Appellant filed a timely appeal from his judgment of sentence and, after this Court affirmed, *see id.*, our Supreme Court denied his petition for allowance of appeal. *Commonwealth v. Manzanet*, 724 A.2d 349 (Pa. 1998). Over the ensuing years, Appellant filed at least two PCRA petitions, both of which were denied by the PCRA court and affirmed on appeal. *See Commonwealth v. Manzanet*, 876 A.2d 466 (Pa. Super. 2005) (unpublished memorandum); *Commonwealth v. Manzanet*, 22 A.3d 1066 (Pa. Super. 2010) (unpublished memorandum), *appeal denied*, 21 A.3d 1191 (Pa. 2011).

On June 25, 2018, Appellant filed an "Application/Request to Seek an Order to Conduct Forensic D.N.A. Testing Pursuant to 42 Pa.C.S.[] § 9543.1" (hereinafter, "Petition"). Therein, Appellant requested DNA testing of a bandana that had been entered into evidence by the Commonwealth at trial. In explaining the import of the bandana, Appellant claimed that he "was

- 4 -

implicated in the crime as the 'shooter' that wore a '[b]andana.'" Petition, 6/25/18, at 1. Appellant then baldly stated, without any discussion, that DNA testing of the bandana "would establish [his] actual innocence." *Id.* at 2.

On August 2, 2018, the PCRA court issued an order directing the Commonwealth to file a response to Appellant's Petition, which it did on August 29, 2018. On September 13, 2018, the PCRA court issued an order denying the Petition.

Appellant filed a timely, *pro se* notice of appeal and concurrently filed a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. On October 23, 2018, the PCRA court issued a Rule 1925(a) opinion. Herein, Appellant presents three questions for our review:

A. Whether the "State of Emergency" initiated by the Department of Corrections on August 29, 2018 impede[d Appellant's] ability to reply to the Commonwealth's answer filed on August 29, 2018[, and] violate[d] the 1st and 14th Amendments to the United States Constitution and Article One Section 9 of the Pennsylvania Constitution when the Commonwealth's answer was returned to sender pursuant to the new security directives?

B. Whether the [PCRA] court error [*sic*] in it's [*sic*] assessment of the facts when it stated that [Appellant] "failed to present this court with a *prima facie* case" that the untested item if tested would show his actual innocence without first: 1) giving [Appellant] time to reply to the Commonwealth's objections; and, 2) without holding an evidentiary hearing where the facts could be developed in support of his request?

C. Whether the [PCRA] court's assessment of the "timeliness" requirement pursuant to [section] 9543.1 go[es] afoul of the spirit and intent of the Legislature without first giving [Appellant] an opportunity to present "extenuating circumstances" as a cause for the delay [in] violat[ion of] the 14th Amendments [*sic*] Equal Protection and Due Process Clauses of the United States Constitution?

Appellant's Brief at viii (unnecessary capitalization and emphasis omitted).

Preliminarily, we note that "[p]ost[-]conviction DNA testing falls under the aegis of the [PCRA,] and thus, '[o]ur standard of review permits us to consider only whether the PCRA court's determination is supported by the evidence of record and whether it is free from legal error.'" ***Commonwealth v. Conway***, 14 A.3d 101, 108 (Pa. Super. 2011) (footnote and citation omitted) (quoting ***Commonwealth v. Brooks***, 875 A.2d 1141, 1144 (Pa. Super. 2005)).

Section 9543.1 of the PCRA, which sets forth the requirements a petitioner must meet to obtain DNA testing, states, in pertinent part, as follows:

**(a) Motion.--**

(1) An individual convicted of a criminal offense in a court of this Commonwealth may apply by making a written motion to the sentencing court at any time for the performance of forensic DNA testing on specific evidence that is related to the investigation or prosecution that resulted in the judgment of conviction.

(2) The evidence may have been discovered either prior to or after the applicant's conviction. The evidence shall be available for testing as of the date of the motion. If the evidence was discovered prior to the applicant's conviction, the evidence shall not have been subject to the DNA testing requested because the technology for testing was not in existence at the time of the trial or the applicant's counsel did not seek testing at the time of the trial in a case where a verdict was rendered on or before January 1, 1995, or the evidence was subject to the testing, but newer technology could provide substantially more accurate and substantially probative results, or the applicant's counsel sought funds from the court to pay for the testing because his client was indigent and the court refused the request despite the client's indigency.

\*\*\*

(4) DNA testing may be sought at any time if the motion is made in a timely manner and for the purpose of demonstrating the applicant's actual innocence and not to delay the execution of sentence or administration of justice.

\*\*\*

(6) The motion shall explain how, after review of the record of the applicant's trial, there is a reasonable possibility if the applicant is under State supervision, or there is a reasonable probability if the applicant is not under State supervision, or after review of the record of the applicant's guilty plea there is a reasonable probability, that the testing would produce exculpatory evidence that would establish:

(i) the applicant's actual innocence of the offense for which the applicant was convicted;

\*\*\*

**(b) Notice to the Commonwealth.--**

(1) Upon receipt of a motion under subsection (a), the court shall notify the Commonwealth and shall afford the Commonwealth an opportunity to respond to the motion.

**(c) Requirements.--**In any motion under subsection (a), under penalty of perjury, the applicant shall:

\*\*\*

(3) present a *prima facie* case demonstrating that the:

(i) identity of or the participation in the crime by the perpetrator was at issue in the proceedings that resulted in the applicant's conviction and sentencing; and

(ii) DNA testing of the specific evidence, assuming exculpatory results, would establish:

(A) the applicant's actual innocence of the offense for which the applicant was convicted;

\*\*\*

**(d) Order.--**

(1) Except as provided in paragraph (2), the court shall order the testing requested in a motion under subsection (a) under reasonable conditions designed to preserve the integrity of the evidence and the testing process upon a determination, after review of the record of the applicant's trial, that the:

(i) requirements of subsection (c) have been met;

(ii) evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been altered in any material respect; and

(iii) motion is made in a timely manner and for the purpose of demonstrating the applicant's actual innocence and not to delay the execution of sentence or administration of justice.

(2) The court shall not order the testing requested in a motion under subsection (a) if, after review of the record of the applicant's trial, the court determines that there is no reasonable possibility for an applicant under State supervision, or there is no reasonable probability for an applicant not under State supervision, or after review of the record of the applicant's guilty plea, the court determines that there is no reasonable probability, that the testing would produce exculpatory evidence that:

(i) would establish the applicant's actual innocence of the offense for which the applicant was convicted;

42 Pa.C.S. § 9543.1.

In the case *sub judice*, Appellant first argues that his constitutional rights were violated when the PCRA court denied his Petition without providing him with an opportunity to reply to the response filed by the Commonwealth on August 29, 2018. Appellant claims that the prison system was in a 'State of Emergency' at the time the Commonwealth filed its response and, therefore, Appellant did not receive the response, nor have time to reply to it, before the court issued the order denying his Petition.

In support of his argument that he had the right to file a response, Appellant relies on Pennsylvania Rules of Appellate Procedure 2113 (Reply Brief) and 2185 (Service and Filing of Briefs), which clearly are not applicable to the PCRA proceedings below. *See* Appellant's Brief at 1. Moreover, section 9543.1(b) requires that the court notify the Commonwealth when a petition for DNA testing is filed, and "afford the Commonwealth an opportunity to respond." 42 Pa.C.S. § 9543.1(b)(1). Nothing in the statute compels the court to then allow the petitioner to respond to the Commonwealth's response. Indeed, the statutory language makes clear that it is the petitioner's burden to plead, *in the petition*, the facts demonstrating the necessity of the requested testing. Accordingly, Appellant's first issue is meritless.

In Appellant's next two issues, he argues that the PCRA court erred in concluding that he failed to present a *prima facie* case that DNA testing of the bandana would demonstrate his actual innocence, and that he did not timely file the Petition. Appellant insists that the court should not have reached these decisions without first holding a hearing, or providing Appellant the opportunity to reply to the Commonwealth's response. As discussed, *supra*, nothing in the statute required the court to allow Appellant to reply to the Commonwealth's response. Moreover, for the reasons stated *infra*, we conclude that Appellant's Petition did not meet the requirements of section 9543.1 and, therefore, the court did not err in denying it without a hearing.

First, we agree with the PCRA court that "Appellant failed to present … a *prima facie* case that the DNA testing of the bandana would result in

evidence, which if exculpatory, would establish his actual innocence." ***See***

PCRA Court Opinion (PCO), 10/23/18, at 8. Our Court has explained that

> the interplay between [sections 9543.1(d)(2) and 9543.1(d)(2)(i)] requires that DNA testing "shall not" be ordered by the PCRA court if there is "no reasonable possibility that the testing would produce exculpatory evidence" that "would establish … actual innocence of the offense for which the applicant was convicted."
>
> Section 9543.1 frequently incorporates, yet fails to define, the term "actual innocence." In ***Conway***, 14 A.3d at 109, this Court applied a definition of 'actual innocence' taken from "the United States Supreme Court in its Opinion in ***Schlup v. Delo***, 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), namely, that the newly discovered [DNA] evidence must make it 'more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt.'"

***In re Payne***, 129 A.3d 546, 556 (Pa. Super. 2015).

Here, as stated *supra*, in Appellant's Petition, he offered no explanation for how or why DNA testing of the bandana would prove his actual innocence. Instead, he merely claimed that the bandana was worn by the shooter and, thus, testing of the bandana would prove his actual innocence. Appellant elaborates somewhat in his brief to this Court, essentially insisting that the absence of his DNA on the bandana would prove that he was not the shooter.

Appellant's argument fails for two reasons. First, even if the lack of Appellant's DNA on the bandana would prove he was not the shooter in this case, that fact does not establish his actual innocence of the crimes for which he was convicted. The Commonwealth presented evidence that Appellant engaged in a conspiracy with Fraticelli. "Once there is evidence of the presence of a conspiracy, conspirators are liable for acts of co-conspirators

- 10 -

committed in furtherance of the conspiracy." ***Commonwealth v. Lambert***, 795 A.2d 1010, 1016 (Pa. Super. 2002). Therefore, even if Fraticelli was the shooter wearing the bandana, Appellant would still be criminally liable for Fraticelli's conduct.

Second, Appellant has offered nothing to support his 'actual innocence' claim other than the potential absence of his DNA from the bandana. "[T]his Court has routinely held that the absence of the accused's DNA, *by itself*, cannot satisfy [s]ection 9543.1(d)(2)(i)'s 'actual innocence' standard." ***In re Payne***, 129 A.3d at 558 (emphasis in original). Consequently, Appellant has failed to demonstrate a *prima facie* case that the absence of his DNA on the bandana would prove his actual innocence.

Alternatively, we would also agree with the PCRA court that Appellant failed to establish that his Petition was "made in a timely manner...." 42 Pa.C.S. § 9543.1(a)(4). In reaching this conclusion, the PCRA court explained:

> Appellant has known of the existence of the bandana, the item that he was seeking DNA testing on, since his arrest, which occurred in 1994. Appellant knew about the bandana's existence during this [t]rial and his conviction, which occurred in 1995 and Appellant failed to raise the issue of the bandana in any and every pleading filed since his conviction, which occurred on July 18, 1995[,] and failed to raise it since 2002 when the statute was enacted and effective.

PCO at 10. We agree with the trial court's timeliness analysis.

We are also unconvinced by Appellant's claim on appeal that his petition was filed "in a timely manner base[d] on the development of new DNA testing

- 11 -

techniques and its acceptance and application by the Pennsylvania State Police and by the Philadelphia Police Crime Lab." Appellant's Brief at 21. Appellant fails to explain why these new DNA-testing techniques were required, or how the DNA testing available in 1995 was inadequate. Additionally, Appellant admits that the "STR" and "Y-STR" testing "was adopted by the Pennsylvania State Police in 2007 and by the Philadelphia Police Crime Lab in 2010[,]" ***id.*** at 20-21, yet he does not discuss why he waited until 2018 to file his Petition. Thus, Appellant has not demonstrated that his Petition was timely filed.

For all of these reasons, we conclude that the PCRA court's denial of Appellant's Petition is supported by the record, and we discern no legal error in that decision.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/10/19