J-S04010-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| NADERA BATSON | : | |
| | : | |
| Appellant | : | No. 1182 EDA 2021 |

Appeal from the PCRA Order Entered April 29, 2021
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0000123-2012

BEFORE:   BENDER, P.J.E., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:              **FILED MARCH 15, 2022**

Appellant, Nadera Batson, appeals *pro se* from the order dismissing her motion for DNA testing filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-9546.  In 2013, Appellant was sentenced to an aggregate term of 28½ - 57 years' imprisonment, following her conviction for third-degree murder, conspiracy, and related offenses.  At trial, the Commonwealth's evidence established that Appellant and her co-defendant essentially tortured and ultimately killed JaQuinn Brewton ("JaQuinn" or "the decedent"), a three-year-old boy left in their care.  Pursuant to Section 9543.1 of the PCRA, Appellant filed a motion for DNA testing ("DNA Motion") of several items seized from her home during the investigation into JaQuinn's untimely

_____

[*] Former Justice specially assigned to the Superior Court.

death.  Appellant now appeals the order denying that motion.  After careful review, we affirm.

A full recitation of the facts adduced at trial can be found in this Court's memorandum decision affirming Appellant's judgment of sentence on direct appeal.  **See Commonwealth v. Batson**, No. 299 EDA 2014, unpublished memorandum at 1-4 (Pa. Super. filed June 23, 2015) (quoting Trial Court Opinion, 3/2/14, at 2-5, 7).  An abridged summary of those facts follows: Appellant and her boyfriend, co-defendant Marcus King ("King"), took three-year-old JaQuinn, Appellant's godson, into their care in March of 2011.  According to King, Appellant would abuse JaQuinn almost daily, often for little or no reason.  She would hit JaQuinn with her hands, but at other times she would strike him with a belt, brush, or shoe.  Appellant would abuse JaQuinn when the toddler touched something that he was not supposed to touch, or when he had accidents because he was not potty-trained.  Appellant would also instruct the child to keep his hands down to prevent him from protecting himself from her blows.  King admitted to abusing JaQuinn as well; however, he also claimed that he occasionally intervened to protect the boy from Appellant due to the severity of her abuse.  Appellant's frequent abuse of JaQuinn was also corroborated by a neighbor, who testified that he heard Appellant beating JaQuinn at least four times a week during the Spring of 2011, and that Appellant would play loud music to drown out JaQuinn's screams.

The abuse escalated, as Appellant burned JaQuinn's feet so badly with a hot liquid that the child could not walk for weeks. On another occasion, King watched Appellant burn JaQuinn's buttocks with a kitchen blowtorch because the child had failed to reach the potty in time. Out of fear of being arrested, Appellant and King did not seek medical attention for JaQuinn on either occasion, despite medical testimony that established that these burns must have caused extreme pain.

On June 29, 2011, the Philadelphia Fire Department, responding to a 911 call, discovered JaQuinn in a squalid bedroom in Appellant's home. He was not breathing, and they could not detect a pulse. Appellant claimed JaQuinn had fallen down a flight of stairs, although the stairs in question were heavily padded, and injuries all over JaQuinn's body aroused further suspicion by the responders. At the hospital, doctors were able to restart JaQuinn's heart, but he never regained consciousness, and he ultimately died on July 12, 2011.

The attending medical team discovered a myriad of significant injuries on JaQuinn's body, including evidence of second-degree burns that had begun to heal on his legs and feet, which were consistent with a hot liquid spill, but inconsistent with Appellant's claim that the boy had stepped into a hot tub, because, *inter alia*, there were no burns on the soles of his feet. They also discovered a still-open, irregular-shaped burn wound on the boy's buttocks that was consistent with the use of a blowtorch as described by King. It was determined that JaQuinn ultimately died due to blunt force trauma to his

abdomen, which had caused lacerations on his pancreas and spleen, and bruises on his liver. These internal injuries occurred at different times, probably a few days apart, and were inconsistent with injuries from the fall downstairs as Appellant had claimed. JaQuinn did not have injuries to his head and extremities that would normally accompany such a fall, whereas his internal injuries were far more consistent with a concentrated blow to abdomen, such as from a punch by an adult. King testified at trial that Appellant had beaten JaQuinn on the night before the 911 call because the child would not stay in bed.

On August 12, 2013, a jury convicted Appellant of third-degree murder, criminal conspiracy (homicide), endangering the welfare of a child, and possessing an instrument of crime. On December 18, 2013, the trial court sentenced Appellant as indicated above, and Appellant subsequently filed a direct appeal. This Court affirmed Appellant's judgment of sentence, and our Supreme Court declined further review. *Commonwealth v. Batson*, 122 A.3d 1140 (Pa. Super. 2015) (unpublished memorandum), *appeal denied*, 129 A.3d 1240 (Pa. 2015). Appellant previously filed an untimely PCRA petition on March 31, 2017, which was denied by the PCRA court on September 21, 2017. Appellant filed a timely appeal therefrom, but that appeal was ultimately dismissed on February 22, 2019, due to Appellant's failure to file a brief.

Appellant filed the at-issue DNA Motion on October 6, 2020, and counsel was appointed. Appointed counsel ultimately filed a ***Turner***/***Finley***[1] letter on March 4, 2021 and a petition to withdraw as counsel. On March 11, 2021, the PCRA court issued notice to Appellant, pursuant to Pa.R.Crim.P. 907, of the court's intent to dismiss the DNA petition. Appellant did not file a response to the court's Rule 907 notice. On April 29, 2021, the court dismissed the DNA Motion, and granted counsel's motion to withdraw. Appellant effectively filed a timely, *pro se* notice of appeal on May 29, 2021.[2] The PCRA court did not

---

[1] ***See Commonwealth v. Turner***, 544 A.2d 927 (Pa. 1988), and ***Commonwealth v. Finley***, 550 A.2d 213 (Pa. Super. 1988).

[2] On June 2, 2021, Appellant's *pro se* notice of appeal was filed. The notice of appeal was due by Tuesday, June 1, 2021. ***See*** Pa.R.A.P. 903(a) (stating notice of appeal shall be filed within 30 days after the entry of the order from which the appeal is taken); 1 Pa.C.S. § 1908 (whenever the last day of the appeal period falls on a weekend or on any legal holiday, such day shall be omitted from the computation of time). Appellant, who is incarcerated, dated the *pro se* notice of appeal May 29, 2021. On August 20, 2021, this Court issued a rule to show cause why the appeal should not be quashed as untimely. Appellant filed a *pro se* response on August 30, 2021, providing documentation of a cash slip from the Department of Corrections, indicating that Appellant mailed her notice of appeal on May 29, 2021, corroborating the date on the notice itself. Notably, the Commonwealth does not dispute that Appellant submitted her notice of appeal to prison authorities for mailing on that date. Nevertheless, independent of the documentation provided by Appellant, it is virtually certain that Appellant mailed the notice of appeal from prison on or before the due date, given that it was received by the court on the day after it was due. By operation of the prisoner mailbox-rule, we deem Appellant's notice of appeal to have been timely filed on May 29, 2021. ***See Commonwealth v. Jones***, 700 A.2d 423, 426 (Pa. 1997) (defining the prisoner-mailbox rule, which provides that "when the appellant is (a) acting *pro se* and (b) incarcerated at the time he or she seeks to file an appeal, justice requires the appeal to be deemed 'filed' on the date that the appellant
*(Footnote Continued Next Page)*

- 5 -

order Appellant to file a Pa.R.A.P. 1925(b) statement.  The court issued its Rule 1925(a) opinion on April 29, 2021.

Appellant now presents the following questions for our review:

A. Did the [PCRA c]ourt err in denying Appellant's Motion for DNA and Biological Evidence Testing?

B. Did the [t]rial [c]ourt err in allowing co[-]defendant Marcus King to be the main evidence against Appellant when his testimony should never have been admitted or impeached by defense counsel?

Appellant's Brief at 4.

## A.

In her first issue, Appellant asserts that the PCRA court erred when it denied her DNA Motion.  Specifically, Appellant contends that the PCRA court should have ordered DNA testing of a rape kit performed on JaQuinn, and on three items seized from Appellant's residence: a comb, a mop, and a kitchen blowtorch.  The PCRA court denied the motion, reasoning that Appellant failed to "present a *prima facie* case that her identity as the perpetrator is at issue[,] or that [favorable results from] DNA testing would prove her actual innocence."  PCRA Court Opinion ("PCO"), 4/29/21, at 4.

> Generally, the trial court's application of a statute is a question of law that compels plenary review to determine whether the court committed an error of law.  When reviewing an order denying a motion for post-conviction DNA testing, this Court determines whether the movant satisfied the statutory requirements listed in

deposits the appeal with prison authorities and/or places it in the prison mailbox").

> Section 9543.1. We can affirm the court's decision if there is any basis to support it, even if we rely on different grounds to affirm.

*Commonwealth v. Williams*, 35 A.3d 44, 47 (Pa. Super. 2011) (cleaned up).

As is pertinent to the PCRA court's analysis,

> [t]he text of the statute set forth in Section 9543.1(c)(3) and reinforced in Section 9543.1(d)(2) requires the applicant to demonstrate that favorable results of the requested DNA testing would establish the applicant's actual innocence of the crime of conviction. The statutory standard to obtain testing requires more than conjecture or speculation; it demands a *prima facie* case that the DNA results, if exculpatory, would establish actual innocence.

*Id.* at 50 (citations omitted).

Here, the PCRA court determined that none of the proposed testing could potentially establish Appellant's actual innocence of the crimes for which she was convicted, reasoning as follows:

> [Appellant] filed a Motion to Compel Production of DNA and Biological material to have DNA testing performed on the decedent's rape kit, a mop, hairbrush, [and] blowtorch…, recovered during the pretrial investigation. Pursuant to [Section] 9543.1, a petitioner requesting postconviction DNA testing must make a *prima facie* showing that the identity of or participation in the crime by the perpetrator was at issue in the proceedings, and DNA testing of the specific evidence, assuming exculpatory evidence, would establish her actual innocence. 42 Pa.C.S. § 9543.1(c); *Commonwealth v. Robinson*, 239 A.3d 154 (Pa. Super. 2020). A successful *prima facie* showing will vary with the circumstances of each case. *Id.* (citing *In re Payne*, 129 A.3d 546, 559 (Pa. Super. 2015)). A court cannot order DNA testing if there is no reasonable possibility that favorable DNA test results would establish actual innocence. *Id.*; *see Payne*, 129 A.3d at 563.
>
> The absence of a petitioner's DNA at the crime scene alone is not sufficient to establish actual innocence. *Commonwealth v. Tyler*, 234 A.3d 750, 754 (Pa. Super. 2020); *accord*

***Commonwealth v. Heilman***, 867 A.2d 542, 547 (Pa. Super. 2005)[]. A petitioner must present additional evidence, in support of her absence of DNA, to establish actual innocence. ***Id.***

[Appellant]'s claim fails because she cannot present a *prima facie* case that her identity as the perpetrator is at issue or that DNA testing would prove her actual innocence. At trial, the Commonwealth presented overwhelming evidence of her guilt, showing that [Appellant] murdered the decedent after a four-month-long period of continual, unspeakable abuse. On June 29, 2011, when firefighters responded to the call that the decedent had fallen down the stairs, [Appellant] was home alone with the unresponsive decedent, who was lying face down on the floor of her apartment. While [Appellant] told firefighters that the decedent had fallen down the stairs and hit his head, this fabricated account was directly contradicted by the testimony of trauma nurses who treated the decedent and Associate Medical Examiner Dr. Aaron Rosen. Their testimony indicated that the decedent's death was caused by blunt force trauma to his abdomen. That traumatic injury, which ruptured the decedent's pancreas, was inconsistent with injuries resulting from a fall down the stairs. ***See*** N.T., 8/7/13, at 2.

Additional evidence presented at trial demonstrated that [Appellant] engaged in a horrifying campaign of abuse that culminated in the decedent's murder. In the month leading up to his hospitalization, Hassan Babb, [Appellant]'s neighbor, heard [Appellant] assault the decedent during the day, at least four times a week. The beatings were so severe that Babb heard them over the loud music emanating from [Appellant]'s apartment. On one occasion Babb intervened by knocking on [Appellant]'s door and demanding her to stop. ***See*** N.T., 8/7/13, at 23.

In the weeks before [JaQuinn]'s death, co-defendant King identified two instances where [Appellant] tortured the decedent…. King discovered that [Appellant] had burned the decedent's feet while [King] was absent from the apartment. The burns were so severe that the child could not walk. N.T., 8/8/13, at 34. King also witnessed [Appellant] burn [JaQuinn]'s buttocks [with a blowtorch] after he had an accident and defecated on the floor. When King attempted to treat the burns with cold, running water, layers of skin fell off.

[Appellant] has not shown that DNA testing would prove her actual innocence. Her claim rests entirely on an underdeveloped and

- 8 -

boilerplate assertion that if the Commonwealth had performed DNA testing on the items, the resulting DNA evidence would establish her innocence. The Commonwealth recovered DNA samples from three items located at [Appellant's] apartment: a blowtorch, hairbrush, and mop. Investigators obtained samples from [the decedent] at the hospital for the purpose of a sexual assault forensic exam, but because the Forensic Science Division of the Philadelphia Police Department did not detect any biological material, [Appellant] was not charged with sexual assault.

As for the remaining items, even if DNA testing had been completed and excluded [Appellant] as an originator [of the] DNA, the jury's verdict would have been the same. While the exact item that [Appellant] used to inflict the death blow to [JaQuinn]'s abdomen is unknown, [t]he overwhelming evidence of [Appellant]'s abuse of the decedent left no reasonable doubt in the jury's mind of her culpability. This [c]ourt agrees with PCRA counsel's determination that [Appellant's] instant motion is meritless, as she cannot establish either requirement of a *prima facie* case [that would entitle her to relief under Section 9543.1].

PCO at 4-6 (some citations reformatted; footnote omitted).

Appellant asserts that DNA testing of the items found in her apartment would potentially point to another culprit, such as her co-defendant, King. *See* Appellant's Brief at 11-12. However, we are wholly unconvinced by her argument given the circumstances of this case. As argued by the Commonwealth, the "possible absence of [Appellant]'s DNA on any of the recovered items from [Appellant]'s home does not preclude the possibility that she in fact did use those items to abuse JaQuinn, even if Marcus King's DNA was also present." Commonwealth's Brief at 15. Furthermore, "even if King's DNA was found on the items, this evidence would not show [Appellant]'s actual innocence. The jury found that [Appellant] conspired with King to kill JaQuinn.

The jury verdict is consistent with the possibility that it was King who used the blowtorch or hairbrush to abuse JaQuinn." *Id.* at 16. In any event,

> none of the items recovered from [Appellant]'s home were responsible for JaQuinn's death, nor critical to [Appellant]'s abuse of JaQuinn. The medical evidence showed that JaQuinn died due to blunt force trauma to his abdomen. Blunt force trauma to his abdomen would be consistent with King's testimony that [Appellant] beat JaQuinn the night before he died. Further, given the testimony by [Appellant]'s neighbor, there was strong circumstantial evidence of [Appellant]'s abuse of JaQuinn. No specific item used in her abuse was necessary in light of the evidence that she was abusing him. DNA testing would not show [Appellant]'s actual innocence.

*Id.* at 16-17 (citations omitted).

We agree with the Commonwealth. Even if the requested DNA tests demonstrated the absence of Appellant's DNA, and/or the presence of King's DNA, such results could not establish Appellant's actual innocence in the circumstances of this case. As to the blowtorch, we note that King admitted that it belonged to him at trial, and, thus, it would be no surprise to the jury if his DNA was discovered on it, or on any other item found in their shared residence. The absence of Appellant's DNA on the blowtorch would also not be sufficient to show a *prima facie* case of her actual innocence, as it is axiomatic that in DNA cases, "as in other areas, an absence of evidence is not evidence of absence." *Heilman*, 867 A.2d at 547.

The same applies to the mop. Appellant argues that the police alleged that she used the mop to conceal evidence of JaQuinn's injuries. Appellant's Brief at 12. However, Appellant's use of a mop for that purpose was also not

a critical fact with respect to any of the crimes for which Appellant was convicted. She was not convicted of any charge related to concealing or tampering with evidence of a crime. The absence of JaQuinn's blood on the mop (a result Appellant contends would be favorable to her) could not prove Appellant's innocence because, again, the absence of evidence is not evidence of absence. Moreover, the absence of JaQuinn's blood on the mop would not contradict the allegation that Appellant caused the internal injuries to JaQuinn that ultimately caused his death, as Appellant points to nothing in the record that suggests those injuries would have caused external bleeding that might have been concealed by cleaning the scene of the crime. Appellant further argues that the mop was in a common area and accessible to other residents. *Id.* Even if true, the absence of JaQuinn's DNA on the mop, and/or the presence of another DNA profile, could not constitute evidence of Appellant's actual innocence.

Likewise, there is no potential DNA profile that, if found on the brush, would tend to exonerate Appellant. None of the offenses for which she was convicted rested solely upon an allegation that Appellant used that item to abuse JaQuinn, and the presence of King's DNA profile would not be a surprise to the jury, since King lived with Appellant and JaQuinn at the relevant time.

As to the rape kit, Appellant was never charged with a sexual offense, and thus DNA results from the rape kit are not related to any offense for which she was convicted. In any event, Appellant does not present any argument in her brief as to how further testing of the rape kit could produce results that

- 11 -

tended to demonstrate her innocence of the crime for which she was convicted. Indeed, Appellant fails to explain how DNA testing is even possible given the factual finding by the PCRA court that "the Forensic Science Division of the Philadelphia Police Department did not detect any biological material" in the sample obtained from JaQuinn at the hospital. PCO at 6.

Appellant cites several cases for our consideration, none of which support her arguments that the PCRA court should have granted her motion for DNA testing. First, in *Payne*, the petitioner was convicted of second-degree murder and related offenses for his participation in a burglary that led to the victim's death, where there was an "absence of any physical evidence demonstrating his guilt[.]" *Payne*, 129 A.3d at 550. Payne was not caught at the scene of the home invasion, and there were no surviving eyewitnesses to the crime. Three witnesses,

> Wallick, Oglesby, and Gibson[,] each purportedly heard Payne make inculpatory statements to them, individually, concerning the … burglary/murder. Although their accounts of Payne's inculpatory remarks were consistent in broad strokes, there were some significant details that varied between them. All three testified that Payne had told them that he was accompanied by two cohorts during the home invasion, and that a telephone had been used as the murder weapon. However, their stories differed considerably with regard to other matters, such as whether Payne had killed [the victim] himself, as well as the identity of his co-conspirators.

*Id.*

> In *Payne*,

> the Commonwealth appeal[ed] from the … order granting … Payne[]'s request for DNA testing of physical evidence taken from

- 12 -

the crime scene of the homicide for which Payne was convicted of second-degree (felony) murder and related offenses. The Commonwealth contend[ed] the trial court erred when it found that there was a reasonable probability that the results of the testing could demonstrate Payne's "actual innocence," as is necessary to assert a successful claim under [Section] 9543.1. Specifically, the Commonwealth argue[d] that the legal framework of Payne's felony murder conviction precludes such a finding because, in order to convict him, the jury was not required to determine whether Payne was the principal actor.

*Id.* at 548–49.

An *en banc* panel of this Court first recognized that "this Court has consistently held that the absence of a petitioner's DNA, by itself, cannot demonstrate "'actual innocence[,]'" but that "the quantum of evidence necessary to satisfy Section 9543.1[,] above and beyond the absence of the petitioner's DNA has been, and should continue to be, determined on a case-by-case basis, as circumstances dictate." *Id.* at 559. Payne did not merely argue that he sought testing to demonstrate the absence of his DNA at the scene of the crime. Instead, "he also assert[ed] that DNA testing might reveal the identity of the person who actually killed the victim" by comparing that DNA to the law enforcement DNA databases. *Id.* at 560. The Commonwealth argued on appeal that the lower court had erred in granting relief under Section 9543.1, contending that Payne's conviction did not necessitate a finding that he had killed the victim, because his conviction was premised on conspiratorial liability for his participation in the burglary. *Id.* Thus, the Commonwealth believed that there was no potential DNA results that could prove Payne's actual innocence.

- 13 -

This Court rejected the Commonwealth's theory. First, Payne's conviction for conspiracy had been reversed during a prior appeal. Second, this Court recognized that, even if the conspiracy conviction had survived, Payne was asserting his innocence as to his involvement in any of the charges associated with the fatal burglary, not solely his murder conviction. Third, Payne's conviction rested entirely on the somewhat inconsistent testimony of three witnesses to his alleged self-incriminatory statements regarding the crime. Finally, the *Payne* Court noted that,

> with respect to the burden on a Section 9543.1 petitioner, "no reasonable probability" does not mean, "no likely probability." It should go without saying that the most likely result of Section 9543.1 DNA testing will corroborate a petitioner's guilt, confirm it outright, or simply fail to cast significant doubt on the verdict. However, the very purpose of Section 9543.1 must be to afford a petitioner the opportunity to demonstrate the unlikely. The threshold question is, therefore, not the likelihood of proof of innocence, but whether it is within the realm of reason that some result(s) could prove innocence.

*Id.* at 563.

Here, by contrast, Appellant was found at the scene of the murder, and was the only person present with the victim. She concocted a claim that JaQuinn had fallen down the steps, thereby admitting her presence at the time he was injured, regardless of whether the cause of the injury was fabricated. Furthermore, direct eyewitness testimony of Appellant's abuse of JaQuinn was provided by her co-defendant, including testimony regarding the beating that likely caused his death. JaQuinn was found unresponsive and critically injured while alone in Appellant's care, and further eyewitness testimony by a

neighbor corroborated multiple instances of prior abuse of the boy at Appellant's hand. These facts are not analogous to **Payne**, where there was no eyewitness to the offense and no physical evidence tying Payne to the scene of the fatal burglary. Here, it is not merely unlikely that DNA testing of the available evidence would tend to prove Appellant's actual innocence, it is wholly unreasonable to believe so in the circumstances of this case, as discussed above. Given these distinctions,[3] we are unconvinced that the PCRA court's decision contravened our holding in **Payne**.

Appellant also cites **Skinner v. Switzer**, 562 U.S. 521 (2011), a federal case that has no bearing on the instant appeal. In **Skinner**, the Supreme Court of the United States held that a convicted state prisoner may seek DNA testing of crime-scene evidence in a civil rights action filed pursuant to 42 U.S.C. § 1983. The Court thereby resolved a conflict in the federal circuit courts, as some federal courts had found that DNA testing claims were "cognizable in federal court only when asserted in a petition for a writ of *habeas corpus* under 28 U.S.C. § 2254." **Id.** at 524. Appellant has filed the current action under a state statute in state court. **Skinner** does not support her claim for relief.[4]

_____

[3] We also note that the procedural posture of these cases is dissimilar, as the Commonwealth had appealed an order *granting* DNA testing in **Payne**.

[4] Appellant cites other federal cases which are inapposite for similar reasons. **D.A.'s Off. for Third Jud. Dist. v. Osborne**, 557 U.S. 52 (2009), and **Grier v. Klem**, 591 F.3d 672 (3d Cir. 2010), both involve DNA-testing claims raised
*(Footnote Continued Next Page)*

Appellant next cites **Commonwealth v. Wright**, 14 A.3d 798 (Pa. 2011), where our Supreme Court held that a confession, even if one previously adjudicated as voluntary, does not constitute a *per se* bar to establishing a *prima facie* case demonstrating that DNA testing would establish actual innocence. **Wright** also does not afford Appellant any relief. Appellant did not confess to any criminal liability, and so **Wright** is not on point. However, even if Appellant's statement to authorities that JaQuinn had fallen down the stairs could be construed as a partial confession that implicates **Wright**, the PCRA court here did not purport to use the admission of that statement into evidence as a *per se* bar to Appellant's ability to obtain relief under Section 9543.1. In **Wright**, by contrast, the Supreme Court remanded to the trial court because the lower court had failed to provide sufficient analysis for the Supreme Court to determine if the lower court had solely relied on Wright's confession to deny relief under Section 9543.1. Here, while the PCRA court relied in some part on Appellant's ostensibly incriminatory statement in its analysis, that was not the only evidence considered by the court in determining Appellant was not entitled to DNA testing of the available evidence and, thus, the lower court did not contravene **Wright**'s rejection of a *per se* bar for relief under Section 9543.1 based on confessions.

---

as federal civil rights actions under Section 1983 and, therefore, are not relevant to DNA-testing claims raised under Section 9543.1 of the PCRA. We must examine Appellant's DNA-testing claim pursuant to the requirements of Section 9543.1, even if federal statutory law provides for greater relief.

Accordingly, we conclude that the record adequately supports the PCRA court's determination that Appellant failed to meet the statutory requirements for DNA testing set forth in Section 9543.1. Accordingly, no relief is due on this claim.

**B.**

In her second claim, Appellant asserts that the trial court "erred in allowing co-defendant Marcus King to be the main evidence against Appellant[.]" Appellant's Brief at 14. Under the auspices of this claim, Appellant argues: that King was offered a deal to testify against her, *id.*; that the prosecutor failed to disclose "the full extent of the deal," *id.*; that her counsel was ineffective for failing to adequately impeach King regarding the deal, *id.*; and that Appellant's sentence was unfair compared to King's, given similar conduct and similar records, *id.* at 15.

The Commonwealth asserts that these claims have all been waived due to Appellant's failure to raise them below. Commonwealth's Brief at 18 (citing Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal.")). Furthermore, the Commonwealth argues that, even if these claims had been raised below, they are waived because Appellant could have raised them in prior proceedings but failed to do so. *Id.* (citing 42 Pa.C.S. § 9543(a)(3) (requiring a petitioner, to be eligible for relief under the PCRA, to prove that "the allegation of error has not been previously litigated or waived")).

However, we cannot reach the question of waiver, as this Court lacks jurisdiction to address the second question presented for our review. A request for DNA testing filed pursuant to Section 9543.1 is itself not subject to the time limitations of the PCRA. *See Commonwealth v. Williams*, 35 A.3d 44, 50 (Pa. Super. 2011) ("This Court has consistently held the one-year jurisdictional time bar of the PCRA does not apply to motions for DNA testing under Section 9543.1."). Yet, with regard to all other claims, the PCRA time limitations implicate our jurisdiction and may not be altered or disregarded in order to address the merits of a petition. *Commonwealth v. Bennett*, 930 A.2d 1264, 1267 (Pa. 2007). Under the PCRA, any petition for post-conviction relief, including a second or subsequent one, must be filed within one year of the date the judgment of sentence becomes final, unless one of the following exceptions set forth in 42 Pa.C.S. § 9545(b)(1)(i)-(iii) applies:

**(b) Time for filing petition.--**

(1) Any petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final, unless the petition alleges and the petitioner proves that:

(i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;

(ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or

(iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or

the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

42 Pa.C.S. § 9545(b)(1)(i)-(iii). "Any petition invoking an exception provided in paragraph (1) shall be filed within one year of the date the claim could have been presented." 42 Pa.C.S. § 9545(b)(2).

Here, Appellant's PCRA petition/DNA Motion,[5] filed on October 6, 2020, is patently untimely with respect to any claim but for the request for DNA testing under Section 9543.1. Nowhere in her brief, or in her initial petition, did Appellant attempt to invoke an exception to the PCRA's jurisdictional time bar. Indeed, as correctly noted by the Commonwealth, Appellant did not raise any of these claims in her DNA motion. Necessarily then, Appellant has failed to plead, much less prove, the applicability of any exception to the PCRA's time bar, as required by Section 9545(b)(1), that would permit this Court to address the claims she now raises for the first time in her brief. Thus, we lack jurisdiction to address all of Appellant's remaining claims.

Order **affirmed**.

---

[5] We note that Appellant did not style her motion for DNA testing as a PCRA petition, and she did not raise any of the claims set forth in the second issue presented in her brief in that motion.

- 19 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>3/15/2022</u>