J-S32005-24

2024 PA Super 257

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
TROY TAQUELL ALVIN :
:
Appellant : No. 2872 EDA 2023

Appeal from the PCRA Order Entered August 17, 2023
In the Court of Common Pleas of Northampton County Criminal Division
at No(s): CP-48-CR-0001323-2003

BEFORE: LAZARUS, P.J., STABILE, J., and KING, J.

OPINION BY LAZARUS, P.J.: **FILED NOVEMBER 4, 2024**

Troy Taquell Alvin appeals, *pro se*, from the order, entered in the Court of Common Pleas of Northampton County, dismissing his petition filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546. After careful review, we affirm.

This Court previously summarized the factual history as follows:

On March 11, 2002, at approximately 9:26 p.m., the police responded to a reported shooting at the corner[] of 7th and Bushkill Streets in Easton, Pennsylvania. When the police arrived, they discovered a white male with several gunshot wounds to the torso lying next to the open driver's side door of his vehicle. The victim was identified as Ronald Plum. [Plum] was transferred to the hospital[,] where he died as a result of the gunshot wounds.

At the scene of the shooting, police interviewed neighbors and potential witnesses[, who] stated that two men were observed arguing, several shots were fired, and one man slumped onto the vehicle. The witnesses reported seeing a black male running from the scene. They stated that he ran up Bushkill Street in the direction of 9th Street. The police also recovered several 9mm

shell casings from the area. Additionally, a cell phone and a pager were taken from the victim's automobile.

Several minutes after arriving at the scene, police received a complaint from a resident of 915 Bushkill Street that a suspicious black male was in his backyard talking on a cell phone. Before the police could arrive, however, the individual jumped a fence and fled the area. Upon investigating, the police discovered a blue "do[]-rag" lying in close proximity to where the individual had jumped the fence. A police [] dog followed the scent from the do[]-rag to 10th Street. A reverse track was also completed, where the [police] dog traced the scent from the do[]-rag back to the area of the shooting.

As part of the investigation, police sent the do[]-rag to the forensic laboratory to determine whether any DNA was present. The laboratory discovered that DNA was present, and analyzed and compared the DNA to those samples contained in CODIS (the Combined DNA Index System). [Alvin] could not be excluded as the donor of the DNA. Consequently, a search warrant was executed authorizing the seizure of two vials of blood from [Alvin]. The results of the comparative analysis of the DNA from the do[]-rag to [Alvin]'s blood [showed] that [Alvin] could not be excluded as a DNA match.

Police also examined [cell phone and pager records and, ultimately,] applied for and received a court order directing Sprint Telephone Company to furnish information for several [] telephone numbers. The order was entered pursuant to 18 Pa.C.S.A. § 5743, the Wiretapping and Electronic Surveillance and Control Act. The information revealed that [Alvin] was the subscriber [of those phone numbers] and that he was in communication with [Plum] prior to the homicide. The records also established that [Alvin] had been in contact soon after the murder with the user of a phone that belonged to Donna Joseph.

At trial, Edward Pope testified that he had arranged a meeting between [Plum] and [Alvin] on the night of the murder. The purpose of the encounter was so that [Alvin] could buy marijuana from [Plum]. [Later t]hat evening, [Alvin] told [] Pope that [Plum] had not shown up for the transaction. A few days later, however, [Alvin] expressed his belief that [Plum] was a police officer. Several weeks after that, [] Pope asked [Alvin] if he had, in fact,

met with [Plum]. [Alvin] admitted that he had, and then stated that "he had to do what he had to do."

James Lambert testified that [Alvin] and Markeith Webb, [Alvin's] cousin, arrived together at [Lambert's] home on the night of the murder. [Alvin] told [Lambert] that he had just "blazed a white guy." [Alvin] explained that he had intended to rob [Plum], but that [Plum] was acting as if he were "5-O."

Angela Joseph testified that she and [] Webb were driving in Easton when [Alvin] called the cell phone she was using, which was registered to her mother, Donna[.] While [Angela] drove, [] Webb gave her directions. Ultimately, they picked up [Alvin] in the area of 10th and Bushkill Streets.

John Culpepper testified that he knew [Alvin] from the time [Alvin] was a child because he was friends with [Alvin's] father. While incarcerated in the Northampton County [Jail] together, [Alvin] told [] Culpepper that he had "murked[,]" [which is slang for killing a person,] a guy, and that he had been seen by a neighbor whose backyard he had been in. [Alvin] was concerned about the neighbor being able to identify him[] and asked [] Culpepper if he would "take care of" the person. [Alvin] was also worried about [] Webb "running his mouth."

Testimony was presented that [Alvin] accompanied Gail Stump, the mother of his children, to purchase a 9mm Ruger two weeks before the murder. [] Stump testified that the last time she saw the weapon, it was in a box that [Alvin] was moving into a storage unit for her prior to the murder. A gun with the same serial number was recovered after the murder during the [unrelated] arrest of Tamir Jackson. [] Jackson acquired the gun from Wilfredo Torres, who acquired the gun from [] Webb. Although ballistic testing of the gun did not produce identification marks on the casings consistent with those found at the crime scene, this discrepancy was accounted for because the gun's barrel had been changed.

[Alvin] was arrested on January 30, 2003. . . . [He] proceeded to a jury trial on February 9, 2004[ and] was convicted on February 16, 2004, of first-degree murder[.] Alvin was sentenced to life imprisonment.

***Commonwealth v. Alvin***, 2206 EDA 2004, **1-5 (Pa. Super. filed June 28, 2005) (unpublished memorandum decision).

On appeal, this Court affirmed Alvin's judgment of sentence, ***see id.***, and our Supreme Court denied Alvin's timely petition for allowance of appeal on April 4, 2006. ***See id.***, 897 A.2d 1183 (Pa. 2006). Between June 2006 and September 2016, Alvin filed six PCRA petitions.[1]

This Court summarized the subsequent procedural history as follows:

On December 21, 2020, [Alvin] filed the instant *pro se* motion for DNA testing[, pursuant to section 9543.1 of the PCRA. Alvin] requested that the State Police conduct additional DNA testing on the do[]-rag using a new testing method known as the TrueAllele probabilistic genotyping software program. ***See*** Mot[ion] for DNA Testing, 12/21/20, at 3-4, 7. In support of his motion, [Alvin] asserted that TrueAllele had been evaluated in peer-reviewed studies in 2009 and 2011. [Alvin] also cited studies from 2005 and 2013[,] which examined DNA mixture interpretation. [Alvin] claimed that DNA testing would establish his actual innocence because it could reveal the identity of the actual assailant when compared to results in state and federal DNA databanks. ***See id.*** at 5.

The PCRA Court appointed Talia Mazza, Esq[uire,] as [PCRA] counsel for [Alvin]. PCRA counsel did not file an amended motion. On April 20, 2021, the Commonwealth filed a response to [Alvin]'s [*pro se*] motion, arguing that the motion should be denied because [Alvin] failed to establish a *prima facie* case that new testing would tend to establish his actual innocence. The Commonwealth also contended that the motion was untimely for several reasons, including the fact that [Alvin] cited a DNA study

_____

[1] All of Alvin's PCRA petitions were denied except for the petition filed on August 31, 2009, wherein the PCRA court granted Alvin's request for reinstatement of his right to file a petition for allowance of appeal with our Supreme Court *nunc pro tunc*. Our Supreme Court ultimately denied Alvin's petition for allowance of appeal. ***See Commonwealth v. Alvin***, 992 A.2d 123 (Pa. 2010) (Table).

that was published in 2013. On June 14, 2021, the PCRA court denied [Alvin]'s motion and vacated PCRA counsel's appointment.

***Commonwealth v. Alvin***, 284 A.3d 900 (Pa. Super. 2022) (Table).

Alvin filed a timely *pro se* notice of appeal and, on August 8, 2022, this Court affirmed in part, vacated in part, and remanded the case to the PCRA court for further proceedings. ***See id.*** In particular, this Court determined that Alvin's PCRA petition, as it related to section 9543.1 for DNA testing, was timely filed and remanded for the PCRA court to determine whether Alvin had presented a *prima facie* case demonstrating that DNA testing would establish his actual innocence. ***See id.***

On remand, on May 11, 2023, the PCRA court issued notice of its intent to dismiss Alvin's PCRA petition without a hearing pursuant to Pa.R.Crim.P. 907. Alvin filed his response, *pro se*, on July 31, 2023. On August 17, 2023, the PCRA court dismissed Alvin's PCRA petition without a hearing. Alvin, acting *pro se*, filed a timely[2] notice of appeal and a court-ordered Pa.R.A.P.

_____

[2] Alvin filed his notice of appeal *pro se* on October 17, 2023, beyond the 30-day filing time limit. ***See*** Pa.R.A.P. 903. However, the trial court failed to notify Alvin of the dismissal of his PCRA petition via **certified** mail, as required by Pa.R.Crim.P. 907(4). ***See*** Pa.R.Crim.P. 907(4) ("When the [PCRA] petition is dismissed without a hearing, the judge promptly shall issue an order to that effect and **shall advise the defendant by certified mail**, return receipt requested, of the right to appeal from the final order disposing of the petition and of the time limits within which the appeal must be filed. The order shall be filed and served as provided in Rule 114.") (emphasis added); ***see also Commonwealth v. Midgley***, 289 A.3d 1111, 1117 (Pa. Super. 2023) (this Court will not quash appeal where trial court failed to comply with Pa.R.Crim.P. 114 but shall treat appeal as timely filed). While ***Midgley*** addresses Rule 114, we conclude that it applies with equal force here, where Rule 907(4) invokes Rule 114 with the added requirement of "shall advise the defendant
*(Footnote Continued Next Page)*

- 5 -

1925(b) concise statement of errors complained of on appeal. Alvin now raises the following claims for our review:

> [1.] Did the PCRA court err in finding that [Alvin] failed to demonstrate a *prima facie* showing that no reasonable juror would have found him guilty beyond a reasonable doubt even if there is a reasonable possibility that favorable results of the requested DNA testing would establish his actual innocence of the crime of conviction as articulated by the United States Supreme Court in [] ***Schlup v. Delo***, 513 U.S. 298 [] (1995)[,] and [this Court] in ***Commonwealth v. Conway***, 14 A.3d 101 (Pa. Super. 2011)[?]
>
> [2.] Did the PCRA court err in failing to consider the plain meaning of the words "actual innocence" as articulated [] in [] ***Schlup*** [] and [] ***Conway***[?]
>
> [3.] Did the PCRA court err in finding that exculpatory results of DNA testing would not establish [Alvin's] "actual innocence" after a review of the trial court record[] in spite of[] ***Schlup*** [] and [] ***Conway***[?]
>
> [4.] Did the PCRA court err in finding[ ]that [Alvin] failed to present a *prima facie* case demonstrating that the DNA testing sought, assuming exculpatory results, would establish his "actual innocence" of the offense for which he was convicted[?]

Brief for Appellant, at iv.

Alvin's claims all relate to the DNA testing of the do-rag pursuant to section 9543.1. It is well-settled that a request for DNA testing under section 9543.1 is not subject to the PCRA time bar. ***See Commonwealth v. Williams***, 35 A.3d 44, 50 (Pa. Super. 2011). Moreover, this Court has

---

by **certified mail**." ***See*** Pa.R.Crim.P. 907(4) (emphasis added). Instantly, as we noted above, the trial court failed to provide notice to Alvin via **certified** mail, as required by Rule 907(4). Accordingly, we conclude that Alvin's appeal was timely filed.

previously determined that Alvin's instant request for DNA testing was timely filed. *See Alvin*, *supra*.

In all of his claims, Alvin argues that the do-rag should be tested under TrueAllele's methodology because it would exclude him as a contributor for DNA and identify the "real perpetrator." *See* Brief for Appellant, at 1-13. Alvin contends that the DNA test result would reveal exculpatory evidence identifying "a separate suspect" who had murdered Plum. *See id.* at 12. We disagree.

"Post-conviction DNA testing falls under the aegis of the PCRA, and thus, our standard of review permits us to consider only [whether] the PCRA court's determination is supported by the evidence of record and whether it is free from legal error." *In re Payne*, 129 A.3d 546, 553-54 (Pa. Super. 2015) (en banc) (brackets, footnotes, quotation marks, and citation omitted).

Section 9543.1 requires that an applicant present a *prima facie* case demonstrating that the

> (i) identity of or the participation in the crime by the perpetrator was at issue in the proceedings that resulted in the applicant's conviction and sentencing; and
>
> (ii) DNA testing of the specific evidence, assuming exculpatory results, would establish:
>
> > (A) the applicant's actual innocence of the offense for which applicant was convicted.

42 Pa.C.S.A. § 9543.1(c)(i)-(ii)(A).

Further, the court shall comply with the following requirements to determine whether testing is necessary:

(1) Except as provided in paragraph (2), the court shall order the testing requested in a motion under subsection (a) under reasonable conditions designed to preserve the integrity of the evidence and the testing process upon a determination, after review of the record of the applicant's trial, that the:

(i) requirements of subsection (c) have been met;

(ii) evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been altered in any material respect; and

(iii) motion is made in a timely manner for the purpose of demonstrating the applicant's actual innocence and not to delay the execution of sentence or administration of justice.

(2) The court shall not order the testing requested in a motion under subsection (a) if, after review of the record of the applicant's trial, the court determines that there is no reasonable possibility for an applicant under State supervision, or there is no reasonable probability for an applicant not under State supervision, or after review of the record of the applicant's guilty plea, the court determines that there is no reasonable probability, that the testing would produce exculpatory evidence that:

(i) would establish the applicant's actual innocence of the offense for which the applicant was convicted[.]

*Id.* at § (d)(1)-(2)(i).

This Court has explained that

the mere absence of a defendant's DNA, by itself, does not satisfy the "actual innocence" requirement under section 9543.1(d)(2)(i). Rather, a petitioner must present some quantum of additional evidence in addition to the absence of petitioner's DNA to establish entitlement to relief.

- 8 -

The quantum of evidence necessary to satisfy section 9543.1(d)(2)(i) above and beyond the absence of the applicant's DNA has never been explicitly defined and must be evaluated on a case-by-case basis.

**Commonwealth v. Tyler**, 234 A.3d 750, 754 (Pa. Super. 2000) (citations and footnote omitted).

Additionally, this Court has stated that this standard requires "a reviewing court to make a probabilistic determination about what reasonable, properly instructed jurors would do[] if presented with the new evidence." **Commonwealth v. Conway**, 14 A.3d 101, 109 (Pa. Super. 2011) (citation and quotations omitted). To do so, the PCRA court "is required to review not only the motion for DNA testing, but also the trial [court] record, and then make a determination as to whether there is a reasonable possibility that DNA testing would produce exculpatory evidence that would establish petitioner's actual innocence." **Williams**, 35 A.3d at 50 (citation and emphasis omitted).

In the PCRA court's notice of intent to dismiss Alvin's petition,[3] it addressed Alvin's claims as follows:

In this case, [Alvin] requests testing of the do[-]rag using the TrueAllele probabilistic genotyping software program. . . . [Alvin has cited to multiple studies to support his argument.] One study is presented to cast doubt on the efficacy of DNA mixture interpretation by outlin[ing] the variations of such tests conducted across several laboratories. The other studies are presented to show a new and more effective method of interpreting DNA mixtures. **However, even accepting these studies as applicable and allowing** [**Alvin**] **all reasonable inferences,**

_____

[3] The PCRA court incorporated its notice of intent to dismiss the petition into its opinion, which was filed on November 21, 2023. **See** PCRA Court Opinion, 11/21/23, at 1.

**no part of his argument speaks to how a DNA test will
establish his actual innocence**.  Rather, [Alvin]'s argument
speaks to a development in DNA testing technology in samples
containing mixtures of DNA which could be grounds for DNA
testing but is only part of [his] burden.  More simply, this only
gets [Alvin] to the review stage.  However, [Alvin] must still
present a *prima facie* case that the DNA testing of the specific
evidence, assuming exculpatory results, would establish his actual
innocence of the offense for which he was convicted.

[Alvin]'s application is largely silent on that issue, only checking
form boxes which assert that the results of a DNA test could be
compared with databanks to reveal the actual assailant and could
produce a confession from that person.  However, [**Alvin**] **offers
no potential exonerating facts or additional evidence which
could be revealed by the DNA test and establish his actual
innocence**.

\* \* \*

The record contains substantial evidence of [Alvin]'s guilt such
that there is no reasonable probability that testing would establish
his actual innocence.  Foremost, the circumstantial evidence of
[Alvin]'s guilt is significant.

\* \* \*

In summary, around one hour before [Plum] was killed, a meeting
between [Plum] and [Alvin] was arranged by Pope.  This meeting
was corroborated by telephone records documenting calls and
pages between [Plum], [Alvin], and Pope.  Later, [Alvin] told Pope
that "he thought [Plum] was a cop, and that 'he had to do what
he had to do.'"  One neighbor heard the firing of shots and saw a
black man running west on Bushkill Street.  Another neighbor
called the police to report a man lingering in his backyard on
Bushkill Street.  A subsequent sweep of that area found a do[-
]rag that was subjected to a DNA test, which was matched to
[Alvin].

Further, [Alvin] fetched a ride from the area, after which he told
others that he had "blazed some white dude."  [Alvin] had access
to a [9mm] gun, matching the caliber bullet of the casings found
at the scene of the crime.  [Alvin] later directed another
[individual] to "get rid of the gun."  By the time that gun was

recovered, the barrel had been changed to inhibit ballistics testing. The foregoing circumstantial evidence is compelling in that multiple pieces of evidence place [Alvin] at the scene, provide[] him access to a murder weapon, and include[] his admissions to committing the crime to others.

Moreover, while the DNA sample taken from the do[-]rag contained DNA from more than one individual, the subsequent results presented at trial contained DNA matched to [Alvin]. If this were a case where evidence with mixed DNA had been previously tested, returned inconclusive results, and [Alvin] had been convicted on tenuous circumstantial evidence, his argument would be more compelling because the new technology might have produced a conclusive result where the previous technology had not. But that is not the case here. The court does not read the cited studies to wholesale undermine the efficacy of all DNA mixture tests, and to interpret them as such is an inference too far.

PCRA Court Notice of Intent to Dismiss, 5/11/23, at 5-11 (some citations and quotations omitted) (emphasis added).

After reviewing the record, we agree with the reasoning and conclusions set forth by the PCRA court. In particular, we agree with the PCRA court that the circumstantial evidence that Alvin was the perpetrator in this case was significant. *See id.* Furthermore, we conclude that Alvin's arguments fail to do anything more than baldly assert that further DNA testing may exclude him as a DNA contributor to the do-rag. We are unpersuaded by Alvin's claims that further DNA testing "could" reveal "the real perpetrator" or "a separate suspect." *See* Brief for Appellant, at 12. As we set forth above, this assertion is insufficient to warrant DNA testing, as "mere absence" of an applicant's DNA is not enough to satisfy section 9543.1's burden. *See Tyler*, *supra*. Consequently, Alvin's claims fail, and he is entitled to no relief.

- 11 -

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/4/2024